**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Don Addington; John Bostic; Mark )   No. CV-08-1633-PHX-NVW
Burman; Afshin Iranpour; Robert Velez;)
Steve Wargocki; individual residents of)   **ORDER**
the State of Arizona, formerly employed)
by America West Airlines, Inc. and)
presently employed by its successor after)
merger, US Airways, Inc., )
                                          )
            Plaintiffs, )
                                          )
vs. )
                                          )
                                          )
US Airline Pilots Association, an)
unincorporated association representing)
the pilots in the employment of US)
Airways Inc.; US Airways, Inc., a)
Delaware corporation, )
                                          )
            Defendants. )
                                          )
_____)

Plaintiff pilots (the "Plaintiff West Pilots") brought suit against their employer, US

Airways Inc. ("US Airways"), and their labor union, the US Airline Pilots Association

("USAPA") seeking injunctive relief and damages.  The complaint alleged that US

Airways breached a collective bargaining agreement and that the union breached its duty

of fair representation.  (Doc. # 1.)  The Plaintiff West Pilots also filed a Motion for a

Preliminary Injunction against US Airways.  (Doc. # 12.)  Both Defendants moved to

dismiss the case for lack of subject matter jurisdiction.  (Docs. # 30, 35, 36.)  In addition,

1   USAPA moved to dismiss for failure to state a claim upon which relief can be granted, or

2   for summary judgment.  (Docs. # 35, 36.)  Because the motion for summary judgment is

3   premature, Fed. R. Civ. P. 56(f), it will be denied.  The remaining motions of USAPA

4   will also be denied.  US Airways' motion to dismiss for lack of subject matter jurisdiction

5   will be granted.  The Motion for Preliminary Injunction against US Airways (doc. # 12)

6   will be denied for lack of jurisdiction, with limited alternative findings of fact and

7   conclusions of law to accelerate appellate review in case it is sought.

8   **I.      FINDINGS OF FACT AND PLAINTIFFS' ALLEGATIONS**

9          **A.      Standards of Review**

10         In considering a motion to dismiss for lack of subject matter jurisdiction, the court

11  "is not confined by the facts contained in the four corners of the complaint—it may

12  consider facts and need *not* assume the truthfulness of the complaint." *Americopters, LLC*

13  *v. F.A.A.*, 441 F.3d 726, 732 n.4 (9th Cir. 2006).  For purposes of a motion to dismiss for

14  failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court accepts as true the

15  allegations in the complaint.  *Porter v. Jones*, 319 F.3d 483, 489 (9th Cir. 2003).  A ruling

16  on a motion for preliminary injunction requires findings of fact and conclusions of law.

17  29 U.S.C. § 107 (applicable to labor disputes); Fed. R. Civ. P. 52(a)(2).  To honor all of

18  these standards, the allegations are summarized below, and necessary findings of fact and

19  conclusions of law are also stated.

20         **B.      Background and Summary of Agreements**

21         The parties have stipulated to many essential facts of the case.  (Doc. # 77.)  Those

22  facts are summarized and supplemented by the following additional findings for purposes

23  of  jurisdiction and possible injunctive relief.

24         This case concerns two sets of pilots.  One set, the West Pilots, were employed as

25  pilots of America West Airlines, Inc. ("America West") before May 2005.  The other set,

26  the East Pilots, were employed by US Airways at the same time.  The terms "East Pilots"

27  and "West Pilots" refer only to pilots who were on the seniority lists of their respective

28

1    airlines at that time.   Both groups of pilots were then represented by the same labor

2    union, the Air Line Pilots Association ("ALPA").

3            Toward the end of 2003, America West and the West Pilots negotiated a collective

4    bargaining agreement effective January 2004 (the "2004 CBA").  That agreement

5    provided that in the event of a merger where America West was not the surviving carrier,

6    America West would make reasonable efforts to have the surviving carrier "integrate the

7    two Pilot groups in accordance with [ALPA's] Merger Policy."

8            In May 2005, America West agreed to merge with US Airways.  The merger

9    agreement provided that US Airways would succeed both air carriers in the combined

10   enterprise.  A few months later, US Airways (now acting as a successor to both airlines),

11   entered into a multilateral contractual agreement with the East Pilots and the West Pilots.

12   This agreement was called the Transition Agreement, and it affected the collective

13   bargaining relationships among the parties.  Though the East Pilots and the West Pilots

14   were both represented by ALPA, the Transition Agreement was signed by Master

15   Executive Councils of both pilot groups.

16           The allegations show that the negotiations and the resulting contract were designed

17   to resolve the tension between competing interests of the East Pilots and the West Pilots.

18   Some terms of the Transition Agreement benefited the East Pilots, some benefited the

19   West Pilots.  The Agreement provided generally that, until the two airlines achieved

20   operational integration, only America West pilots would fly on pre-merger America West

21   aircraft and on western flights that were current and announced as of the time of the

22   agreement (collectively, "West Operations").  A parallel provision existed for the East

23   Pilots as to pre-merger US Airways aircraft and eastern flights (collectively, "East

24   Operations").  Subject to the Transition Agreement, US Airways could continue to

25   operate each airline separately, in accordance with the terms of each carrier's collective

26   bargaining agreement.

27           The Transition Agreement provided that during separate operations the parties

28   were to adopt a single integrated seniority list "in accordance with ALPA Merger Policy,"

1    and the parties were bound to accept the list if it complied with certain criteria.  However,

2    this new seniority list would not be effective until the two operations were integrated.

3    The Transition Agreement also specified that during separate operations any newly hired

4    pilots (the "New Hires") would be placed on a third seniority list and made junior to all

5    pilots on the America West and old US Airways seniority lists.  US Airways had a

6    significant number of pilots on furlough status at the time of the merger, so the parties

7    agreed that America West could not hire new pilots until all furloughed US Airways

8    pilots had been offered recall.  Separate operations under separate seniority lists would

9    continue until two events took place: the completion of an integrated seniority list and the

10   negotiation of a single collective bargaining agreement.  Within twelve months thereafter,

11   operations would be consolidated under a single Federal Aviation Administration

12   operating certificate and the single seniority list would govern.

13          Pursuant to ALPA Merger Policy, the two groups of pilots attempted to create a

14   single integrated seniority list through mediation.  This attempt failed.  Pursuant to the

15   same policy and the Transition Agreement, the East Pilots and the West Pilots brought the

16   matter to binding arbitration in October 2006, and arbitrator George Nicolau issued his

17   decision in May 2007, which included a new seniority list (the "Nicolau Award").  This

18   list gave the West Pilots seniority over the East Pilots who were on furlough at the time of

19   the merger, gave 517 East Pilots seniority over all West Pilots, and blended the seniority

20   of the West Pilots and the remaining East Pilots.  The arbitrator considered the arguments

21   of both sides and explained why he considered this award fair and reasonable under the

22   circumstances.  US Airways was a much older airline than America West, and for that

23   reason the West Pilots would have fallen lower on a merged date-of-hire list than they

24   would have under the Nicolau Award.  However, at the time of the merger, US Airways

25   had dim economic prospects.  The company was insolvent and operating in bankruptcy

26   reorganization, and it had 1,751 pilots on furlough status.  America West, by contrast,

27   was in stronger financial condition, and all of its pilots were on active status.  The

28   arbitrator concluded that the superior employment prospects of the West Pilots justified a

1 superior position in the seniority list. At the same time, he declined to give the West

2 Pilots the full seniority that they requested. On December 20, 2007, US Airways accepted

3 this seniority list.

4       **C.**      **Formation and Purpose of USAPA**

5       The East Pilots were unhappy with the results of the arbitration.  In response, they

6 used their majority status to form a new union, USAPA.  On April 18, 2008, the National

7 Mediation Board certified USAPA as the exclusive collective bargaining representative of

8 all pilots employed by US Airways.  USAPA has shown itself to be hostile to the

9 arbitrated seniority list.  During the campaign to start USAPA, its proponents expressly

10 promised that the new union would not follow the Nicolau Award.  USAPA has refused

11 its duty under the 2004 CBA and the Transition Agreement to bargain for implementation

12 of the Nicolau seniority list.

13       USAPA's Constitution declares its objective "[t]o maintain uniform principles of

14 seniority based on date of hire and the perpetuation thereof, with reasonable conditions

15 and restrictions to preserve each pilot's un-merged career expectations."  To this end,

16 USAPA has convened a merger committee made up of twelve East Pilots and no West

17 Pilots.  This committee has formulated a date-of-hire seniority policy, which includes

18 certain conditions and restrictions but is greatly more favorable to the East Pilots,

19 including those East Pilots on furlough at the time of the merger, than the Nicolau Award.

20 The conditions and restrictions do not eliminate or counterbalance the relative

21 disadvantage the date-of-hire policy poses to the West Pilots.  The chairman of the

22 committee testified that the policy was designed to address the pre-merger career

23 expectations of each pilot group, but he also admitted on cross-examination that he never

24 considered the impact that this policy would have on the West Pilots.  The chairman also

25 admitted that in formulating the policy, he gave no consideration to the relative financial

26 condition of each of the merging airlines, or to the fact that many East Pilots were on

27 furlough status at the time of the merger.  The date-of-hire policy was submitted to US

28 Airways on September 30, 2008, but US Airways has not yet responded.

1    A single collective bargaining agreement has not been reached.  In the meantime,

2  US Airways has maintained separate East and West Operations under separate seniority

3  lists, as the Transition Agreement expressly entitles it to do until operations are

4  consolidated and a merged seniority list effectuated.

5    **D.    The Pilot Furloughs**

6    In the years since the merger, US Airways has offered recall to all of the East

7  Pilots who were previously furloughed.  Eight hundred of those pilots accepted recall.

8  US Airways has brought in about 100 additional New Hires.  But with the airline industry

9  now in decline, US Airways has begun the process of furloughing approximately 300

10  pilots, starting on October 1, 2008.  Because the furloughs are separately administered

11  within each of the merged airlines, some West Pilots are being furloughed in the West

12  Operations while East Pilots junior to them on the Nicolau merged seniority list are

13  retained in the East Operations.   US Airways may operate the two airlines separately

14  under the plain terms of the Transition Agreement, but only because operations are not

15  yet consolidated and a merged seniority list is not in effect.  Allegedly, West Pilots are

16  also being furloughed ahead of New Hires, which the Transition Agreement is claimed to

17  proscribe even during separate operations.

18    Before the merger, financial difficulties at US Airways prompted the East Pilots to

19  make substantial concessions in their collective bargaining agreement relating to pay and

20  conditions of employment.  According to the Nicolau Award, the West Pilots' CBA is

21  significantly more favorable than the East Pilots' CBA.  Other things being equal, it is in

22  US Airways' economic interest to furlough West Pilots before it furloughs East Pilots

23  during separate operations.

24    **E.    Plaintiffs' Claims for Relief**

25    The Plaintiff West Pilots bring this action against USAPA and US Airways

26  seeking damages for lost wages and benefits and a permanent injunction that they

27  negotiate a single collective bargaining agreement implementing the Nicolau seniority

28  list.  They also seek a preliminary injunction against furloughing any West Pilot

1   employed as of September 25, 2005, if the employer retains any New Hire or any East
2   Pilot who was on furlough on that date.  (Doc. # 57-2.)  For purposes of the furloughs, the
3   preliminary injunction would give the West Pilots the benefit of the Nicolau seniority list
4   under consolidated operations by requiring US Airways to lay off junior East Pilots and
5   New Hires and to transfer West Pilots to their positions.  Alternatively, US Airways could
6   comply with the preliminary injunction by keeping flights it has decided to end, or by
7   laying off neither group and paying non-working pilots, things the Transition Agreement
8   absolves US Airways from having to do.

9        The Plaintiff West Pilots allege in Count One that US Airways breached its
10  collective bargaining agreement by furloughing West Pilots ahead of New Hires and
11  failing to furlough West Pilots and East Pilots according to the Nicolau Award. Present
12  application of the Nicolau Award requires a strained reading of the Transition Agreement
13  because the Transition Agreement expressly permits use of separate seniority lists during
14  separate operations.  The better avenue to relief under the Nicolau Award lies in trying to
15  blame the airline for the union's delay in the bargaining.  Indeed, Count Two does that
16  very thing, charging US Airways with the failure to exert every reasonable effort in
17  negotiating a new collective bargaining agreement under the Transition Agreement.[1]  On
18  this theory, if reasonable negotiating efforts had been made, operations would have been
19  consolidated and the Nicolau Award would protect the West Pilots.  Count Three charges
20  USAPA with breach of its duty of fair representation of the West Pilots in these affairs.

21

22

23

---

24        [1] The complaint alleges that the airline has failed to negotiate "in good faith."  This
25  pleading is understood to invoke the duty of the employer under the Railway Labor Act "to
    exert every reasonable effort to make . . . agreements." 45 U.S.C. § 152 First; *see also Flight*
26  *Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 544 (9th Cir. 1992) (comparing this
    duty to the duty of good faith under the National Labor Relations Act and holding that the
27  Railway Labor Act standard requires "at least" the same avoidance of bad faith that the
28  NLRA requires).

1  **F.    Other Proceedings**

2      One America West pilot has filed a grievance under the 2004 CBA regarding the

3  impending furlough.  The grievance was denied and referred to a Board of Adjustment

4  convened under the Transition Agreement.  The grievance asserts breach of the Transition

5  Agreement but no breach of the duty of fair representation and no breach of the obligation

6  to exert every reasonable effort in negotiations under the Transition Agreement.   USAPA

7  has also filed a grievance with the Board of Adjustment.  The grievance addresses only

8  one issue raised in the Plaintiff West Pilots' complaint: US Airways' intent to furlough

9  New Hires ahead of the West Pilots.  This grievance does not relate to the Nicolau Award

10  in any way; it only alleges a violation of the airline's obligation under the transition

11  agreement to furlough all New Hires ahead of all West Pilots and East Pilots.  USAPA is

12  not attempting to vindicate the West Pilots' other breach of contract claims.

13  **II.    ANALYSIS**

14      The Plaintiff West Pilots have brought this action without trying to exhaust their

15  administrative remedies.  On this basis, both Defendants moved to dismiss for lack of

16  subject matter jurisdiction.  Because subject matter jurisdiction must be considered with

17  close reference to the claim against USAPA, the union's motion to dismiss for failure to

18  state a claim is addressed first.

19      **A.    Sufficiency of the Allegations Against USAPA**

20      USAPA moved to dismiss Count Three of the complaint, which alleged that

21  USAPA breached its duty of fair representation of the West Pilots. Ordinarily, a

22  disagreement between a union and its membership is not a breach of that duty.  In this

23  case, however, the allegations state in specific terms that the union has taken

24  impermissible measures to avoid representing the West Pilots fairly.

25      The general duty of fair representation arises from the Railway Labor Act itself.

26  45 U.S.C. § 151–152; *Laturner v. Burlington N., Inc.*, 501 F.2d 593, 599 n.12 (9th Cir.

27  1974).  A union breaches this duty when its conduct toward a member is "arbitrary,

28  discriminatory, or in bad faith."  *Jones v. Union Pac. R.R.*, 968 F.2d 937, 941 (9th Cir.

1    1992) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).  This duty is narrowly construed

2    so that unions have the latitude to act in what they perceive to be the best interests of their

3    members.  *Id.*  At the same time, post-merger seniority issues involve many sensitive,

4    irreconcilable interests that put pilots' unions in a difficult position.  "ALPA's adoption of

5    a merger policy . . . shows that ALPA itself realizes such cases pose a difficult task of

6    balancing not just divergent, but polarized interests."  *Bernard v. Air Line Pilots Ass'n,*

7    *Int'l, AFL-CIO*, 873 F.2d 213, 217 (9th Cir. 1989).

8            USAPA vehemently argues that it had every right to renounce its express

9    obligation to the ALPA Merger Policy and the arbitrated seniority award, to which it is

10   bound by the 2004 CBA and the Transition Agreement.  It says it may recant a prior

11   bargaining position and adopt a seniority policy based upon date of hire.  Seniority rights

12   "are creations of the collective bargaining agreement, and so may be revised or abrogated

13   by later negotiated changes in this agreement."  *Hass v. Darigold Dairy Prods. Co.*, 751

14   F.2d 1096, 1099 (9th Cir. 1985).  As a general proposition, the seniority scheme under the

15   Nicolau Award is not the only permissible way to resolve post-merger seniority issues

16   within unions.  For instance, there is nothing *per se* unacceptable about a seniority

17   agreement based on the date of hire.  *Laturner*, 501 F.2d at 599; *Rakestraw v. United*

18   *Airlines, Inc.*, 981 F.2d 1524, 1533 (7th Cir. 1992).  USAPA refers repeatedly to these

19   principles at their highest level of generality.  The problem is, though the benefit of the

20   Nicolau Award is surely what motivates the West Pilots, their legal objection to

21   USAPA's date-of-hire seniority policy is not directly substantive, but rather procedural.

22   The alleged breach of the duty stems from the bad faith manner of USAPA's determined

23   attempts to evade the Award.  Irrespective of whether seniority rights "vest" in a

24   proprietary sense, a union may not arbitrarily abridge those rights after a merger solely

25   for the sake of political expediency.  *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 800

26   (7th Cir. 1976); *see also Rakestraw*, 981 F.2d at 1531.

27           The Ninth Circuit has not dealt directly with this fact situation, but the union's

28   position flies against the headwind of cases from other circuits.  The D.C. Circuit has held

1   that a union breaches its duty of fair representation when it "arbitrarily adopt[s] and

2   announce[s] a bargaining policy on seniority merger motivated only by a desire to win the

3   votes of a majority of the employees." *Truck Drivers & Helpers, Local Union 568 v.*

4   *NLRB*, 379 F.2d 137, 145 (D.C. Cir. 1967).  This is so because to adopt such a policy

5   under the circumstances "would . . . constitute a default by [the union] in its obligation to

6   represent fairly all the employees in the unit for which it becomes the exclusive

7   bargaining representative."  *Id.*  Along the same lines, a union may not delegate its

8   decision-making function to a referendum of employees "with the understanding that their

9   actions will be motivated solely by their own personal considerations" because such a

10  referendum violates the union's duty to consider the views of all those it represents.

11  *Branch 6000, Nat'l Ass'n of Letter Carriers v. NLRB*, 595 F.2d 808, 812 (D.C. Cir. 1979).

12  USAPA was formed and has taken action as a creature of majority will.  Though the will

13  of the majority is not inherently discriminatory, *see id.*, in this case the East Pilots are

14  alleged to have targeted the Nicolau Award in a way that gives scant consideration to the

15  West Pilots' interest.  By casting off the brokered arrangement after its predecessor

16  agreed to the process by which it was reached, USAPA "has renounced any good faith

17  effort to reconcile the interests" of both pilot groups.  *Truck Drivers*, 379 F.2d at 142-43.

18      Even more to the point, the Seventh Circuit has rejected in dictum the defense that

19  USAPA offers for its conduct.  In *Air Wisconsin Pilots Protection Committee  v.*

20  *Sanderson*, the shoe was on the other foot; the plaintiff pilots had tried and failed to oust

21  ALPA as their representative in order to undermine an ALPA arbitrator's post-merger

22  seniority award.  909 F.2d 213, 215 (7th Cir. 1990).  Writing for the court, Judge Posner

23  held that the union had not breached but honored the duty of fair representation by

24  abiding by the arbitrated seniority list.  *Id.* at 216.  ALPA's arbitration system met a

25  demand for finality and fairness in a contentious labor environment.  *Id.*  Judge Posner

26  went on to consider what might have been if the plan to oust the union had succeeded:

27  "[A]n attempt by a majority of the employees in a collective bargaining unit to gang up

28  against a minority of employees in the fashion apparently envisaged by the plaintiffs

could itself be thought a violation of the duty of fair representation by the union that the majority used as its tool." *Id.* at 217. This dictum fits into the doctrinal backdrop and is well taken.

Decades ago, the Supreme Court explained the principles underlying the union's duty here:

> [T]he representative is clothed with power not unlike that of a legislature which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights. . . .
> . . . [W]e think that Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of a craft, to represent the craft, did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority.

*Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 198-99 (1944). The Plaintiff West Pilots allege that the East Pilots have manipulated union procedures for their sole benefit. They formed a union whose constituted purpose was to impose a date-of-hire scheme on the minority membership in disregard of an arbitrated compromise both sides agreed to and deemed fair in advance. The Plaintiff West Pilots allege that USAPA has followed through on that aim without any corresponding benefit to the pilots as a whole. In light of these principles and the cases cited above, the Plaintiff West Pilots have stated a claim for breach of the duty of fair representation.

USAPA contends that Judge Posner's *Air Wisconsin* dictum was repudiated in *Rakestraw v. United Airlines, Inc. Rakestraw* held that ALPA's departure from its own merger policy did not automatically violate the duty of fair representation because on the facts of that case the merger policy was likely to obstruct agreement with the airline and within the union. 981 F.2d. at 1533. Here, there was no such obstruction. The airline explicitly agreed in the 2004 CBA to make reasonable efforts to integrate seniority lists in accordance with ALPA's merger policy—in this case, the Nicolau Award. 2004 CBA § 1(F)(2). The Transition Agreement requires negotiation toward implementation of the same award, and there is a statutory obligation to exert every reasonable effort in these

1    negotiations.  Transition Agreement §§ IV(A), V, VI(A); 45 U.S.C. § 152 First.

2    Moreover, the *Rakestraw* court noted that ALPA did not depart from its policy without

3    "emphasizing negotiations between representatives of the two [pilot] groups" to avoid

4    intra-union litigation.  981 F.2d at 1533.  USAPA is alleged to have done just the

5    opposite, constituting itself and taking action without regard to the minority view, and

6    indeed provoking this suit.

7        The *Rakestraw* decision contains only one citation of *Air Wisconsin*, and that

8    citation is favorable.  Although *Rakestraw* reaffirms the principle that a union may

9    change its bargaining position and adopt a date-of-hire policy, it nowhere disavows Judge

10   Posner's dictum.  *Rakestraw* does not permit a union to formulate its policy in an

11   improper manner.  *Rakestraw*, 981 F.2d at 1535 ("The change must rationally promote

12   the aggregate welfare of employees in the bargaining unit.").  Like many other cases

13   USAPA cites on fair representation, *Rakestraw* will not bear the weight USAPA places

14   upon it.

15       USAPA also asserted at oral argument that the union majority's right to approve

16   any new collective bargaining agreement subjected the Nicolau Award to a "political

17   veto."[2]  This argument begs the question.  In essence, USAPA argues that it can never be

18   a breach of the duty of fair representation for the majority to seize its own interest.  "With

19   respect, this is a very poor argument.  Minority rights imply a limitation on rights of the

20   majority . . . ." *Air Wisconsin*, 909 F.2d at 216.  The union majority may not discriminate

21   against certain members without a rational basis for doing so, grounded in the aggregate

22   welfare of its employees.

23       The claim against USAPA is ripe for adjudication.  At least in these circumstances,

24   what USAPA calls a mere "bargaining position" can be the subject of a fair representation

25

26

27       [2] Exercise of that "political veto" for the reasons supposed may well breach USAPA's
     duty to exert every reasonable effort in negotiations as required by the Transition Agreement
28   and 45 U.S.C. § 152 First.

1    claim.[3]  It satisfies the constitutional case or controversy requirement to allege, as the

2    Plaintiff West Pilots have, that USAPA has breached its duty by deliberately delaying the

3    single collective bargaining agreement in order to frustrate its pre-existing obligation to

4    the minority and thereby causing injury to the West Pilots in the form of ongoing

5    furloughs and other detriments.  *See Archer v. Airline Pilots Ass'n Int'l*, 609 F.2d 934,

6    937 (9th Cir. 1979) (describing when claim accrues for limitations purposes); *United*

7    *Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1273 (7th Cir. 1985)

8    (same).

9          USAPA's argument on the six-month statute of limitations also fails as to the

10   sufficiency of the pleadings.  USAPA argues that the limitations period started running

11   when the plaintiffs should have known that ALPA may have breached its duty of fair

12   representation.  However, the Plaintiff West Pilots brought suit against USAPA, not

13   against ALPA, and in the six months before filing, USAPA allegedly violated its duty by

14   its continued attempts to obstruct use of the Nicolau Award.  *See Ass'n of Flight*

15   *Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 547-48 (9th Cir. 1992)

16   (allowing district court to consider pre-limitations period conduct to shed light on conduct

17   during the limitations period, as long as violation on which plaintiff relies occurred within

18   the period)*; cf. Air Wisconsin*, 909 F.2d at 217 (stating, in dictum, that when the union

19   reconstitutes itself in a discriminatory fashion, the duty of fair representation might be

20   breached "by the union that the majority used as a tool").  In effect, USAPA argues that

21   the Plaintiff West Pilots have sued too early and too late.  Both arguments fail.

22         Nor is this claim an improper attempt to challenge USAPA's certification, as

23   USAPA suggests.  There is no representational dispute in this case, nor does the dispute

24   depend only upon conduct occurring prior to the certification of USAPA.  *See*

25

26

---

27         [3] On this point, counsel for USAPA is admonished that unpublished dispositions and
orders of the Ninth Circuit issued before January 1, 2007, are not precedent and "may not be
28   cited to the courts of this circuit."  9th Cir. R. 36-3(a), (c).

1  *McNamara-Blad v. Ass'n of Prof'l Flight Attendants*, 275 F.3d 1165, 1170 & n.1 (9th Cir.

2  2002).

3          For these reasons, the Plaintiff West Pilots have stated a claim for a breach of the

4  duty of fair representation.

5      **B.      Subject Matter Jurisdiction: Claims Against US Airways (Counts One
               and Two)**

6

7          Of course, no relief can be granted by this court in the absence of subject matter

8  jurisdiction.  Defendants argue that jurisdiction is lacking because the Plaintiff West

9  Pilots failed to exhaust their administrative remedies.  The Railway Labor Act provides

10  that disputes between employees and their employers concerning the interpretation of

11  labor agreements may be referred by petition of either party to the Board of Adjustment.

12  45 U.S.C. § 184 (airline industry); 45 U.S.C. § 153 First (i) (railroad counterpart).

13          Both of the claims against the airline arise under the operative terms of the

14  Transition Agreement: the first alleges a violation of its substantive terms, and the second

15  alleges a violation of the obligation imposed by that agreement to exert every reasonable

16  effort in negotiations.  These disputes are deemed "minor" in the Railway Labor Act

17  parlance because they involve the "interpretation or application of collective bargaining

18  agreements."  *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Aloha

19  Airlines, Inc.*, 776 F.2d 812, 815 (9th Cir. 1985).  In minor disputes, the Board of

20  Adjustment provides the exclusive remedy.  *Consol. Rail Corp. v. Ry. Labor Execs.

21  Ass'n*, 491 U.S. 299, 310 (1989).  However, where a union acts "in concert" with the

22  carrier–employer, setting up "schemes and contrivances" to stymie aggrieved employees,

23  no administrative remedy need be pursued.  *Glover v. St. Louis-S.F. Ry. Co.*, 393 U.S.

24  324, 331 (1969); *Croston v. Burlington N. R.R.*, 999 F.2d 381, 387 (9th Cir. 1993).

25  Rather, "[j]oinder of the employer is permissible" in the court proceedings against the

26  union.  *Raus v. Bhd. Ry. Carmen of the U.S. and Can.*, 663 F.2d 791, 797-98 (8th Cir.

27  1981).

28

1    The Plaintiff West Pilots have neither alleged nor presented any specific facts

2    suggesting collusion.  "[A]ccusations of 'bad faith' do not excuse an attempt to use the

3    grievance–arbitration machinery." *Bailey v. Bicknell Minerals, Inc*, 819 F.2d 690, 693

4    (7th Cir. 1987); *see also Anderson v. Babbitt*, 230 F.3d 1158, 1164 (9th Cir. 2000)

5    (requiring objective evidence to substantiate allegations of administrative bias).  While no

6    exhaustion is required where the plaintiff makes specific allegations that the employer

7    colluded in the union's breach of the duty to represent fairly, the conclusory allegations in

8    this case are insufficient to establish collusion.  *Crusos v. United Transp. Union, Local*

9    *1201*, 786 F.2d 970, 973 (9th Cir. 1986); *Masy v. N.J. Transit Rail Operations, Inc.*, 790

10   F.2d 322, 327 (3d Cir. 1986).  The Plaintiff West Pilots point to no specific instance

11   where US Airways acted in concert with USAPA to thwart operational integration.  There

12   is no indication that US Airways intends to stall negotiations in order to avoid

13   implementing the Nicolau Award.  US Airways accepted the Nicolau Award, as the

14   Transition Agreement required.  Operational integration is in US Airways' financial

15   interest.  The record does not suggest that US Airways has chosen to furlough West Pilots

16   chiefly because they are better compensated or because US Airways harbors some

17   improper animus toward them.  Even if the union's goals or means were improper, the

18   record does not show that the airline pursued or shared those goals or means.  This type of

19   coincident inaction bears no resemblance to the racist conspiracy in *Glover*, nor is it

20   comparable to the case where the union's bad-faith failure to process an employee's

21   grievance shelters an employer's decision to wrongfully discharge that employee.  *Vaca*

22   *v. Sipes*, 386 U.S. 171, 185-86 (1967).  The Plaintiff West Pilots allege nothing more than

23   a speculative connection between failure of the airline to consummate negotiations and

24   the union's breach of its duty.  Where there are no facts supporting the allegations of

25   collusion, exhaustion of the claims against the airline is required.

26   The Plaintiff West Pilots invoke one additional exception to the exhaustion

27   requirement, contending that it would be futile to bring their claims before a Board of

28   Adjustment as provided by the Transition Agreement.  Failure to exhaust administrative

1    remedies may be excused if exhaustion would be a futile effort. *See Jones*, 968 F.2d at

2    942. The fact that the board is composed of union and company representatives does not

3    by itself render the process futile. *See United Farm Workers of Am., AFL-CIO v. Ariz.*

4    *Agric. Employment Relations Bd.*, 727 F.2d 1475, 1478-80 (9th Cir. 1984) (en banc);

5    *Haney v. Chesapeake & Ohio R.R.*, 498 F.2d 987, 992 (D.C. Cir. 1974). Likewise, the

6    fact that the administrative body is likely to rule against the plaintiffs on the merits does

7    not necessarily render exhaustion futile. *Everett v. U.S. Air Group*, 927 F. Supp. 478, 485

8    (D.D.C. 1996), *aff'd*, 194 F.2d 173 (D.C. Cir.), *cert. denied*, 528 U.S. 815 (1999); *see*

9    *also Atkins v. Louisville & Nashville R.R.*, 819 F.2d 644, 649-50 (6th Cir. 1987). The

10   Plaintiff West Pilots argue that the arbitration process is improperly tainted because

11   representatives of USAPA cannot be expected to make impartial decisions regarding the

12   Nicolau Award. The Plaintiff West Pilots have alleged the union's foundational

13   commitment to date-of-hire seniority, and it is this commitment and the manner in which

14   it arose that allegedly breached USAPA's duty of fair representation. If USAPA is in fact

15   breaching its duty in this manner, an arbitral process that relied on the participation of

16   USAPA members might be "tainted," rendering exhaustion futile under *Glover. See*

17   *Dean v. Trans World Airlines, Inc.*, 924 F.2d 805, 811 (9th Cir. 1991); *cf. Peters v.*

18   *Burlington N. R.R.*, 931 F.2d 534, 541-42 (9th Cir. 1990). Any such concern abated prior

19   to oral argument, however, when US Airways and USAPA agreed to purge the taint.

20   Under the Transition Agreement, the Board of Adjustment is composed of two company

21   representatives, two union representatives, and a neutral. The company and the union

22   have agreed to waive their representatives on this board, so that it would consist of one

23   neutral and one neutral alone for purposes of these claims.[4] There is no longer a danger

24   that union representatives would improperly influence the decision-making process. *Cf.*

25   *Stanton v. Delta Air Lines, Inc.*, 669 F.2d 833, 837-38 (1st Cir. 1982). For these reasons,

26

27   _____

28       [4] USAPA has agreed to waive its representatives only as to Counts One and Two of
the complaint. Its waiver does not extend to Count Three, the fair representation claim.

US Airways' motion to dismiss Counts One and Two of the Complaint for lack of subject matter jurisdiction will be granted.

Before dismissal of the airline is ordered, however, it must be considered whether Fed. R. Civ. P. 19 requires the employer to be joined as a party because its presence may be necessary for complete relief in the claim against the union. As the Third Circuit has noted, "the presence of the employer should not be a means of circumventing the [Board of Adjustment's] exclusive jurisdiction over minor contractual disputes." *Masy*, 790 F.2d at 327. Nor is it "appropriate to join an employer to a breach of duty of fair representation claim so that binding arbitration or some similar remedy may be ordered" because the Plaintiff West Pilots have not sought an order compelling their union to arbitrate. *Id.* Because no facts have been alleged or shown connecting union malfeasance with the company's actions, no remedy lies against the company in this court, and complete relief may be granted against USAPA in its absence. *See Czosek v. O'Mara*, 397 U.S. 25, 28-29 (1970) (holding that a union may be held independently liable for damages that flowed from its own conduct). US Airways need not remain a party and will be dismissed.[5]

### C.    Subject Matter Jurisdiction: Claim Against USAPA (Count Three)

#### 1.    No statutory exhaustion requirement

With respect to the union, however, a different exhaustion analysis governs. While the Railway Labor Act requires employees to exhaust certain claims against their employer,  there is no corresponding statutory exhaustion requirement for claims against the union. Section 153 First (i) "makes no reference to disputes between employees and

---

[5] The court has considered entering final judgment at this time dismissing the claims against US Airways. The court declines to do so because there is "just reason for delay" in entry of a final judgment. Fed. R. Civ. P. 54(b). There would be little benefit to the parties in a final judgment now because this court will conclude this case promptly, at which time all aggrieved parties may appeal. Moreover, if discovery or further events show actual collusion of US Airways in USAPA's alleged breach of duty of fair representation, the court would consider a motion to amend the complaint to renew the allegation of a hybrid claim against US Airways.

their representative." *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 205 (1944). The same is true under the parallel provision for the airline industry, 45 U.S.C. § 184. Thus, "[t]he Railway Labor Act provides no [extrajudicial] remedy for grievances between employees and unions where the allegation is that the union breached its duty of fair representation." *Crusos v. United Transp. Union, Local 1201*, 786 F.2d 970, 973 (9th Cir. 1986); *accord Czosek v. O'Mara*, 397 U.S. 25, 27-28 (1970) ( "[A] suit against the union for breach of its duty of fair representation is not within the jurisdiction of the National Railroad Adjustment Board or subject to the ordinary rule that administrative remedies should be exhausted before resort to the courts."); *Conley v. Gibson*, 355 U.S. 41, 44-45 (1957).

USAPA argues that the Norris-LaGuardia Act, 29 U.S.C. § 107-108, requires exhaustion of remedies in any labor dispute where injunctive relief is sought, including employees' claims that a union breached its duty of fair representation. This contention is without merit. The Supreme Court has held to the contrary more than once. *See Graham v. Brotherhood of Locomotive Firemen & Enginemen*, 338 U.S. 232, 239-40 (1949);[6] *Glover*, 393 U.S. at 326, 328; *see also Parks v. Int'l Bhd. of Elec. Workers*, 314 F.2d 886, 918 n. 56 (4th Cir. 1963) (explaining that the Norris-LaGuardia Act "does not apply to all

---

[6] In *Graham*, the Court stated as follows:

Nor does the Norris-LaGuardia Act contain anything to suggest that it would deprive these Negro firemen of recourse to equitable relief from illegal discriminatory representation by which there would be taken from them their seniority and ultimately their jobs. Conversely there is nothing to suggest that, in enacting the subsequent Railway Labor Act provisions insuring petitioners' right to nondiscriminatory representation by their bargaining agent, Congress intended to hold out to them an illusory right for which it was denying them a remedy. If . . . there remains any illusion that under the Norris-LaGuardia Act the federal courts are powerless to enforce these rights, we dispel it now. The District Court has jurisdiction to enforce by injunction petitioners' rights to nondiscriminatory representation by their statutory representative.

338 U.S. at 239-240.

1    circumstances in which, on its face, it might be thought to apply," such as suits "to

2    compel a union to perform its statutory duty of fair representation").  Though the

3    Supreme Court in more recent years has hesitated to create similar new exceptions, *see,*

4    *e.g.*, *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 711-

5    12 (1982), USAPA cites no case undoing the central holding of *Graham*.  An employee

6    may still bring suit to enjoin a discriminatory union action that fails to comport with fair

7    representation.  *Burlington Northern R.R. v. Bhd. of Maint. of Way Employees*,  481 U.S.

8    429, 445 n.11 (1987) (restating this holding of *Graham*).

9         The Plaintiff West Pilots have no statutory duty to exhaust non-judicial remedies

10   for their breach of fair representation claim.

11                    **2.    No contractual exhaustion requirement**

12        Nonetheless, contractual remedies sometimes require exhaustion, failing which the

13   employee may not bring suit against his union for breach of the duty of fair

14   representation.  Employees generally must exhaust a union's internal grievance

15   procedures that can provide the remedy sought.  *Clayton v. Auto. Workers*, 451 U.S. 679,

16   685-86 (1981) (Labor Management Relations Act case); *Jones v. Union Pac. R. Co.*, 968

17   F.2d 937, 942 (9th Cir. 1992) (extending same requirement to Railway Labor Act);

18   *Frandsen v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station*

19   *Employees*, 782 F.2d 674, 684 n. 10 (7th Cir. 1986) (same).

20        USAPA cites no language in its Constitution or other internal documents by which

21   the West Pilots could compel USAPA to negotiate a single collective bargaining

22   agreement implementing the Nicolau Award or to pay them their damages for not having

23   done so already.  The Constitution merely requires internal resolution of election disputes

24   and disciplinary actions concerning the acts of individual members.  There is no provision

25   that would extend to this dispute.  Moreover, if the union did provide an internal remedy

26   for a breach of duty of fair representation, exhausting it would be only a precondition to

27   suit, not necessarily a replacement for it.  *See Clayton*, 451 U.S. at 692-93.  The court

28   would also retain discretion to excuse exhaustion on grounds of futility.  *Id.*; *see also*

1  *Beriault v. Local 40, Super Cargoes & Checkers of Int'l Longshoremen's &*
2  *Warehousemen's Union*, 501 F.2d 258, 266 (9th Cir. 1974) (Labor Management Relations
3  Act case).

4        Internal union procedures aside, sometimes the grievance procedure in the
5  collective bargaining agreement must be pursued for a breach of duty of fair
6  representation.  At least where the union is alleged to have breached its duty by not
7  challenging the employer's wrong to the employee, the Ninth Circuit has stated that
8  "employees must exhaust contractual grievance procedures before bringing an action
9  against the employer for breach of a collective bargaining agreement" and that "[t]his
10 requirement applies with equal force to claims brought against a union for breach of the
11 duty of fair representation."  *Croston v. Burlington N. R.R.*, 999 F.2d 381, 385-86 (9th
12 Cir. 1993) (citing non-Railway Labor Act case), *overruled on other grounds by Hawaiian*
13 *Airlines, Inc. v. Norris*, 512 U.S. 246 (1994).  In *Croston*, the duty of fair representation
14 claim was predicated upon the employer's  breach of the collective bargaining agreement,
15 which the union failed to pursue.  999 F.2d at 385-86.  The employee could not pursue a
16 judicial claim against the employer and the union because he himself failed to seek an
17 available administrative remedy against the employer, and nothing precluded him from
18 doing so.  *Id.*  The non-Railway Labor Act case *Croston* cites involved parallel facts.  *See*
19 *Beriault*, 501 F.2d at 260-61, 263-66; *accord Meaux v. Nw. Airlines, Inc.*, No. C 05-3733,
20 2006 WL 4045928, at *4, 2006 US Dist LEXIS 96895, at *10-13 (N.D. Cal. Oct. 11,
21 2006) (claim against the union was predicated on the validity of the claim against the
22 airline that the plaintiff was faulted for failing to grieve against the airline).

23       This line of authority does not address cases where the union is sued for its breach
24 of duty of fair representation that injures the employee with or without an additional legal
25 wrong by the employer.  Here the Plaintiff West Pilots make a freestanding claim that
26 USAPA breached its duty of fair representation by obstructing implementation of the
27 Nicolau Award.  USAPA's conduct is the prime mover.  Its culpability does not depend
28 on any fault of the airline, which could be a victim along with the employees.  It is not

1   necessary to adjudicate any dispute between the West Pilots and US Airways to

2   adjudicate the fair representation claim.  It is not at all clear that the *Croston* line of cases

3   empowers a union, by means of its collective bargaining agreement, to detour an

4   employee's stand-alone claim against the union out of court and into the union-and-

5   employer-controlled process for resolving disputes by or against the employer.

6        This case does not give occasion to decide that question.  USAPA has not argued

7   or shown that any contract adequately provides for or requires administrative resolution

8   of this fair representation claim.  The Transition Agreement requires arbitration only for

9   disputes between "[t]he Airline Parties collectively" (referring to the merging airlines)

10  and "the Association" (referring to the Air Line Pilots Association, to which USAPA is

11  the successor collective bargaining representative).  The phrase "the Association" is read

12  to include individual union members.  *See Croston*, 999 F.2d at 386 n.2; *see also* 45

13  U.S.C. § 184 (providing that employees' grievances be resolved by a board of

14  adjustment)*; Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1052 n.9 (11th Cir. 1996)

15  (concluding that an individual airline employee is statutorily entitled to grieve before a

16  special board of adjustment).  The Agreement expressly recognizes the possibility that an

17  individual employee can be a grievant, for it provides that "an employee of any of the

18  Airline Parties who is a grievant, witness, pilot representative, or Board Member shall

19  receive" transportation to and from grievance proceedings.  Transition Agreement §

20  X.H.5.

21       Nonetheless, the Transition Agreement does not reach a dispute of this nature.  A

22  dispute concerning the duty of fair representation arises between the union and its

23  represented employees.  It is not a dispute between US Airways and the employees.  It

24  falls outside the Agreement.  The same result obtains under the 2004 CBA, which

25  provides a grievance procedure for "[a]ny Pilot or group of Pilots who has a grievance

26  concerning any action of the Company." 2004 CBA § 20(A)(1).  The jurisdiction of the

27  2004 CBA Board of Adjustment is limited to "grievances filed by any Pilot . . . growing

28  out of the interpretation or application of any of the terms of this Agreement." 2004 CBA

1 § 21(A)(2).  These provisions do not encompass internal union disputes over the duty of

2 fair representation.  *See  Beriault*, 501 F.2d at 266 (holding that a grievance procedure in

3 a CBA need not be exhausted for "claims relating to breach of the duty of fair

4 representation in negotiating the collective bargaining agreement" because "plaintiffs

5 seek modification of the contract, a remedy not available through the grievance

6 procedure")

7      As noted above, the West Pilots must still exhaust administrative remedies for their

8 claims against the airline, which rest on independent legal grounds, although they arise

9 out of a common set of facts.  It is therefore appropriate to bifurcate this dispute into

10 separate arbitration proceedings against the airline and judicial proceedings against the

11 union.  *See Clayton*, 451 U.S. at 694-95 (disfavoring, but not disallowing, bifurcated

12 actions that share the same legal and factual origins under the Labor Management

13 Relations Act); *Raus*, 663 F.2d at 799 (holding, post-*Clayton*, that an action must be

14 bifurcated as exhaustion requirements of the Railway Labor Act dictate).  Jurisdiction is

15 therefore proper for the claims against USAPA in Count Three.  28 U.S.C. § 1337.

16     **D.**    **Preliminary Injunction**

17      Because there is no jurisdiction over the Plaintiff West Pilots' claims against the

18 airline, there should be no need to consider whether a preliminary injunction against the

19 airline is warranted.  However, the order denying the Motion for Preliminary Injunction

20 will be appealable, and the Plaintiff West Pilots assert great urgency in their request to

21 restrain the furloughs not in accord with the Nicolau Award seniority.  In order to

22 accelerate appellate consideration, if it is sought, and to reduce risk of multiple appeals on

23 this motion, the court finds it appropriate to state in the alternative that no preliminary

24 injunction would be granted if jurisdiction existed.

25      To obtain preliminary injunctive relief, a plaintiff must demonstrate "that he is

26 likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

27 of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

28 in the public interest." *Winter v. NRDC*,  No. 07-1239, 2008 WL 4862464, at *9, 2008

U.S. LEXIS 8343, at *24  (U.S. Nov. 12, 2008). "[T]he less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam).  In a labor dispute, a district court has jurisdiction to grant injunctive relief only if it finds as follows:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

> (b) That substantial and irreparable injury to complainant's property will follow;

> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

> (d) That complainant has no adequate remedy at law; and

> (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C § 107.  The facts presented would not justify the preliminary injunction sought. The preliminary injunction would prevent furlough of West Pilots ahead of New Hires and ahead of East Pilots who were on furlough at the time of the 2005 merger.  As of now, the claims against the airline, the irreparable harm, and the balance of hardships all land short.

The economic consequences of a lapse in employment—loss of pay, status, and other benefits—can be remedied for the most part with damages and a permanent injunction in the near future.  *See Sampson v. Murray*, 415 U.S. 61, 89-90 (1974). Conversely, significant hardships would befall US Airways from the preliminary injunction.  That hardship might be warranted if the airline were culpable in the failure to effect a single collective bargaining agreement by now, but the Plaintiffs have not presented persuasive evidence of that.

1    Moreover, exercising its business judgment, US Airways seeks to reduce losses on

2 some flights and aircraft.  It negotiated for the right to do so under the Transition

3 Agreement and has ordered its operations on that assumption.  If the court were to enjoin

4 the furlough of West Pilots, the airline's business judgment would still require it to reduce

5 service on some flights and aircraft flown by West Pilots.  One result of a preliminary

6 injunction might be the continued payment of West Pilots who are not working.  Another

7 result might be transfer of West Pilots to East Operations before operations are

8 consolidated, a great business burden against which US Airways expressly protected itself

9 in the Transition Agreement.  If preliminary relief were granted and permanent relief

10 denied later, the operations of US Airways would have paid a grave and unjustified cost.

11 If preliminary relief were denied and permanent relief granted later, the West Pilots could

12 be largely compensated for their loss by the union, the airline, or both.  Of particular

13 importance in alternatively denying a preliminary injunction on balance of hardships is

14 this court's ability and resolve to conclude this case on an accelerated basis, within three

15 months or less.  Thus, neither the threat of irreparable injury nor the balance of hardships

16 would justify a preliminary injunction against the airline's furloughs.

17    IT IS THEREFORE ORDERED that Defendant US Airline Pilots Association's

18 Motion to Dismiss or, in the Alternative, for Summary Judgment (docs. # 35, 36) is

19 denied.

20    IT IS FURTHER ORDERED that Defendant US Airways' Motion to Dismiss for

21 lack of jurisdiction (docs. # 30) is granted.

22    IT IS FURTHER ORDERED that Plaintiff's Motion for a Preliminary Injunction

23 (doc. # 12) is denied for lack of jurisdiction.

24    DATED this 20th day of November, 2008.

25

26    _____
       Neil V. Wake
27    United States District Judge

28