1  **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Don Addington; John Bostic; Mark Burman; Afshin Iranpour; Roger Velez; Steve Wargocki,<br><br>Plaintiffs,<br><br>vs.<br><br>US Airline Pilots Association; US Airways, Inc.,<br><br>Defendants. | No. CV 08-1633-PHX-NVW (consolidated)<br><br>**ORDER** |
| Don Addington; John Bostic; Mark Burman; Afshin Iranpour; Roger Velez; Steve Wargocki, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Steven Bradford; Paul Diorio; Robert Frear; Mark King; Douglas Mowery; John Stephan, et al.,<br><br>Defendants. | CV08-1728-PHX-NVW |

Plaintiff pilots brought suit on their own behalf and on behalf of a proposed class of similarly situated pilots alleging that Defendant US Airline Pilots' Association ("USAPA") breached its duty of fair representation. Both parties requested a jury trial in their initial pleadings (docs. # 86, 88), but the West Pilots now oppose USAPA's request, arguing that

USAPA has no Seventh Amendment right to a jury trial here.[1] In order to facilitate the prompt resolution of this case, the court has asked counsel to brief the jury trial issue at this stage. That briefing is now complete. (Docs. # 159, 161, 169.) Although no jury trial would be warranted if the plaintiffs sought only injunctive relief, such a trial will be granted because their case includes a claim for compensatory damages.

**I.     Factual Background**

A summary of Plaintiffs' allegations follows, as stated in a previous order of this Court. *See Addington v. USAPA*, 588 F. Supp. 2d 1051, 1055-57 (D. Ariz. Nov. 20, 2008) [Doc. # 84].

This case concerns two sets of pilots. One set, the West Pilots, were employed as pilots of America West Airlines, Inc. ("America West") before May 2005. The other set, the East Pilots, were employed by US Airways, Inc. ("US Airways") at the same time. The terms "East Pilots" and "West Pilots" refer only to pilots who were on the seniority lists of their respective airlines at that time. Both groups of pilots were then represented by the same labor union, the Air Line Pilots Association ("ALPA").

Toward the end of 2003, America West and the West Pilots negotiated a collective bargaining agreement effective January 2004 (the "2004 CBA"). That agreement provided that in the event of a merger where America West was not the surviving carrier, America West would make reasonable efforts to have the surviving carrier "integrate the two Pilot groups in accordance with [ALPA's] Merger Policy."

In May 2005, America West agreed to merge with US Airways. The merger agreement provided that US Airways would succeed both air carriers in the combined enterprise. A few months later, US Airways (now acting as a successor to both airlines), entered into a multilateral contractual agreement with the East Pilots and the West Pilots. This agreement was called the Transition Agreement, and it affected the collective bargaining

---

[1] Fed. R. Civ. P. 38(d) provides that "A proper demand [for a jury trial] may be withdrawn only if the parties consent." This consent requirement does not extend to demands that are not "proper," that is, where no right to a jury trial exists.

- 2 -

relationships among the parties. Though the East Pilots and the West Pilots were both represented by ALPA, the Transition Agreement was signed by Master Executive Councils of both pilot groups.

The allegations show that the negotiations and the resulting contract were designed to resolve the tension between competing interests of the East Pilots and the West Pilots. Some terms of the Transition Agreement benefited the East Pilots, some benefited the West Pilots. The Agreement provided generally that, until the two airlines achieved operational integration, only America West pilots would fly on pre-merger America West aircraft and on western flights that were current and announced as of the time of the agreement. A parallel provision existed for the East Pilots as to pre-merger US Airways aircraft and eastern flights. Subject to the Transition Agreement, US Airways could continue to operate each airline separately, in accordance with the terms of each carrier's collective bargaining agreement.

The Transition Agreement provided that during separate operations the parties were to adopt a single integrated seniority list "in accordance with ALPA Merger Policy," and the parties were bound to accept the list if it complied with certain criteria. However, this new seniority list would not be effective until the two operations were integrated. The Transition Agreement also specified that during separate operations any newly hired pilots would be placed on a third seniority list and made junior to all pilots on the America West and old US Airways seniority lists. US Airways had a significant number of pilots on furlough status at the time of the merger, so the parties agreed that America West could not hire new pilots until all furloughed US Airways pilots had been offered recall. Separate operations under separate seniority lists would continue until two events took place: the completion of an integrated seniority list and the negotiation of a single collective bargaining agreement. Within twelve months thereafter, operations would be consolidated under a single Federal Aviation Administration operating certificate and the single seniority list would govern.

Pursuant to ALPA Merger Policy, the two groups of pilots attempted to create a single integrated seniority list through mediation. This attempt failed. Pursuant to the same policy

1   and the Transition Agreement, the East Pilots and the West Pilots brought the matter to
2   binding arbitration in October 2006, and arbitrator George Nicolau issued his decision in
3   May 2007, which included a new seniority list (the "Nicolau Award").  This list gave the
4   West Pilots seniority over the East Pilots who were on furlough at the time of the merger,
5   gave 517 East Pilots seniority over all West Pilots, and blended the seniority of the West
6   Pilots and the remaining East Pilots.  The arbitrator considered the arguments of both sides
7   and explained why he considered this award fair and reasonable under the circumstances.
8   US Airways was a much older airline than America West, and for that reason the West Pilots
9   would have fallen lower on a merged date-of-hire list than they would have under the
10  Nicolau Award.  However, at the time of the merger, US Airways had dim economic
11  prospects.  The company was insolvent and operating in bankruptcy reorganization, and it
12  had 1,751 pilots on furlough status.  America West, by contrast, was in stronger financial
13  condition, and all of its pilots were on active status.  The arbitrator concluded that the
14  superior employment prospects of the West Pilots justified a superior position in the seniority
15  list. At the same time, he declined to give the West Pilots the full seniority that they
16  requested. On December 20, 2007, US Airways accepted this seniority list.

17          The East Pilots were unhappy with the results of the arbitration.  In response, they
18  used their majority status to form a new union, USAPA.  On April 18, 2008, the National
19  Mediation Board certified USAPA as the exclusive collective bargaining representative of
20  all pilots employed by US Airways.  USAPA has shown itself to be hostile to the arbitrated
21  seniority list.  During the campaign to start USAPA, its proponents expressly promised that
22  the new union would not follow the Nicolau Award.  USAPA has refused its duty under the
23  2004 CBA and the Transition Agreement to bargain for implementation of the Nicolau
24  seniority list.  In the meantime, US Airways has fallen on hard times and has furloughed
25  some West Pilots ahead of East Pilots who would have been junior to them if the Nicolau
26  Award had been implemented.

27          The named West Pilots brought this class action alleging that USAPA breached its
28  duty of fair representation by, among other things, causing the breach of contractual duties

to honor the Nicolau Award. They seek injunctive relief and "damages to compensate Plaintiffs for the value of lost wages and benefits caused by the injuries alleged herein." They have moved to certify a class that seeks only injunctive relief and the restitution of union dues and fees paid to USAPA.

## II. Analysis

The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal (as opposed to equitable) in nature and involves a matter of "private right." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 n.4 (1989). In this case, the fair representation claim is legal in nature because it rests on contract-related claims and seeks legal relief in the form of compensatory damages.

The Supreme Court has established a three-part test to determine whether the Seventh Amendment right attaches. Only the first two parts are relevant here: "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first." *Id.* at 42 (internal quotation marks and citations omitted).

### A. Nature of the Claim

A claim that the union breached its duty of fair representation is analogous to an equitable claim against a trustee, historically a creature of equity. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567-68 (1990). Nonetheless, this characterization does not end the inquiry because "[t]he Seventh Amendment question depends on the nature of the *issue* to be tried rather than the character of the overall action." *Id.* at 569.

Here, the West Pilots allege that the union has failed in its duty by causing the breach of numerous contractual arrangements. As this Court understands the allegations, these agreements established a framework for the fair resolution of seniority issues. By arbitrarily disparaging them, the union has jettisoned its duty of fair representation. In fact, this consolidated action originally included contract-based claims against other defendants: state-

- 5 -

1 law claims which have already been dismissed as preempted and federal labor law claims
2 which have been dismissed for failure to exhaust administrative remedies.  Seventh
3 Amendment analysis in a fair representation action does not turn on the ability of the plaintiff
4 to maintain separate legal claims. *Terry*, 494 U.S. at 569-70 n.6.

5 Thus, as a historical matter, this lawsuit includes both legal and equitable aspects. The
6 duty in this case is most analogous to a trustee's duty, enforceable in equity. But the liability
7 itself is a function of contractual issues, which are legal in nature. *See id.* at 569-70 (breach
8 of contract); *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1328-29 (2d Cir. 1993)
9 (intentional interference with contract). "The first part of our Seventh Amendment inquiry,
10 then, leaves [the Court] in equipoise as to whether respondents are entitled to a jury trial."
11 *Terry*, 494 U.S. at 570.

12 **B.     Nature of Remedy**

13 The second stage of the inquiry leaves no doubt that the Plaintiffs' case involves legal
14 claims. Plaintiffs seek two primary forms of relief. First, they seek an injunction ordering
15 USAPA "to negotiate and implement a single collective bargaining agreement that fully
16 implements the Nicolau List." Second, they seek "damages to compensate Plaintiffs for the
17 value of lost wages and benefits caused by the injuries alleged herein." In their Motion for
18 Class Certification (doc. # 120), Plaintiffs make clear that their class action limits their
19 proposed class's monetary claim to a refund of union dues and fees.

20 "It goes without saying that an injunction is an equitable remedy." *Weinberger v.*
21 *Romero-Barcelo*, 456 U.S. 305, 311 (1982). If the injunction were the only relief Plaintiffs
22 sought, this Court would be inclined to hold that no jury trial right exists. The fundamentally
23 equitable nature of that remedy would establish the equitable character of the fair
24 representation issue under *Terry*. Plaintiffs seek other relief, however, which is legal, and
25 the Constitution requires a jury to decide issues common to legal and equitable claims.

26 Plaintiffs' claims for lost wages against the union are legal in nature because they are
27 compensatory. "The backpay sought by [Plaintiffs] is not money wrongfully held by the
28 Union, but wages and benefits they would have received from [US Airways]" had the union

- 6 -

1 not breached its duty. *Terry*, 494 U.S. at 570-71. "Such relief is not restitutionary" because the union is not unjustly enriched by the employer's failure to pay wages. *Id.* at 571. This type of relief is "clearly different" from equitable backpay, where the employer is made to return (rather than replace) moneys rightfully belonging to the plaintiff. *See id.* at 572.

It is of no moment that as a matter of historical practice, courts of equity would grant monetary awards against trustees who breached their fiduciary duties. In *Terry*, the Court considered and rejected this very argument. *Id.* at 571 n.8. The monetary relief sought here is in the nature of compensatory damages, as illustrated above. It is this general character of the remedy that guides this analysis, not the niceties of eighteenth-century chancery. Indeed, historical reality compels this pragmatic approach because the line separating law from equity jurisdiction was not clearly drawn even in those ancient days. *See Terry*, 494 U.S. at 577 (Brennan, J., concurring); 3 W. Blackstone, Commentaries 436-37 (1st ed. 1765-1769). Thus, "[t]he second part of [Seventh Amendment] analysis . . . should not replicate the abstruse historical inquiry of the first part, but requires consideration of the general types of relief provided by courts of law and equity." *Terry*, 494 U.S. at 571 n.8 (internal quotation marks and citation omitted).

Plaintiffs argue that the chief thrust of their complaint is equitable, and that their motion for class certification limits class remedies to injunctive and restitutionary relief. This contention is without force. Regardless of the limited nature of Plaintiffs' class action, the amended complaint still seeks a damages remedy on behalf of the named Plaintiffs. And even if the first trial in this case only addresses the liability facts, the Supreme Court has made it clear that the jury right cannot be impaired "by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action, or during its pendency." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959). The Court continued, "[O]nly under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims." *Id.* No imperative circumstances exist here. The issue of USAPA's liability *vel non* in law and

1  equity must be tried to a jury. If subsequent or separate factual issues respecting equitable
2  relief arise, it may be that those issues are tried to the bench.

3  It is not now necessary to decide whether, in the absence of Plaintiffs' lost wage
4  claims, the claims for a refund of class members' union dues and fees would require a jury
5  trial. A preliminary analysis reveals doubts surrounding this particular monetary claim.
6  First, it is unclear whether the Plaintiffs have adequately alleged recovery of dues and fees
7  as a form of relief in their First Amended Complaint. Second, it is unclear what legal
8  grounds the Plaintiffs can claim as a basis for a refund of dues and fees in a fair
9  representation case. At the moment, it is enough to say that the named Plaintiffs' claim for
10 compensatory damages supports the Seventh Amendment right.

11                **B.     The *Ramey* Decision**

12 One district court has reached a contrary conclusion on similar, but not identical facts.
13 *See Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 473 F. Supp. 2d
14 365, 373 (E.D.N.Y. 2007). Like this case, *Ramey* involved a fair representation action
15 seeking injunctive and monetary relief. Unlike this case, the union in *Ramey* was not said
16 to have caused a breach of contract. Equally important is that decision's characterization of
17 backpay damages claims against the union as "incidental" to injunctive relief sought. *See*
18 *id.* at 373. *Ramey* held that no jury right attached to such damages because they "merely
19 make the injunction fully effective." *Id.* In this respect, it is necessary to depart from
20 *Ramey's* reasoning.

21 In *Terry*, the Supreme Court noted that a monetary award "incidental to or intertwined
22 with injunctive relief may be equitable." 494 U.S. at 572 (internal quotation marks and
23 citation omitted); *see also Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93,
24 97-98 (1991) (summarizing this aspect of *Terry*). The authority underlying this statement
25 undercuts its apparent force, however. In neither case *Terry* cites were plaintiffs allowed to
26 try "incidental" claims for legal damages without a jury. *See Tull v. U.S.*, 481 U.S. 412, 424
27 (1987); *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92 (1960). Each case
28 simply reaffirmed the rule that the Seventh Amendment requires no jury for equitable awards

1 of restitution. *Terry* itself articulates no new standard for "incidental" damages of a legal
2 nature; it scarcely reaches the question because the plaintiff had sought no equitable relief
3 at all. *See* 494 U.S. at 571.

4 When *Terry* is read in the larger context of Seventh Amendment doctrine, it does not
5 support the broad reading put forth in *Ramey*. It has long been the rule that a showing that
6 legal damages are "incidental" to an injunction, on its own, is not sufficient to escape the
7 Seventh Amendment mandate. Justice Black wrote to this effect in *Dairy Queen, Inc. v.*
8 *Wood*, finding the argument so repellent that he disposed of it at the threshold before the
9 substantive facts of the case were presented. 369 U.S. 469, 470-73 (1962). Such an
10 exception was not an intended result of the merger of law and equity; practice taught that it
11 would pose a great threat to Seventh Amendment rights. *Id.* at 471–72. "[A]fter the adoption
12 of the Federal Rules, attempts were made indirectly to undercut [the Seventh Amendment]
13 by having federal courts in which cases involving both legal and equitable claims were filed
14 decide the equitable claim first. . . . [A]ny issue common to both the legal and equitable
15 claims was finally determined by the court and the party seeking trial by jury on the legal
16 claim was deprived of that right as to these common issues." *Id.* at 472.

17 *Beacon Theatres* corrected this trend, Justice Black explained, by holding that "where
18 both legal and equitable issues are presented in a single case, 'only under the most imperative
19 circumstances, circumstances which in view of the flexible procedures of the Federal Rules
20 we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior
21 determination of equitable claims.' That holding, of course, applies whether the trial judge
22 chooses to characterize the legal issues presented as 'incidental' to equitable issues or not."
23 *Id.* at 472–73 (citing *Beacon Theatres*, 359 U.S. at 510-11). Years later, the Court put it
24 more bluntly: "[W]here equitable and legal claims are joined in the same action, there is a
25 right to jury trial on the legal claims which must not be infringed either by trying the legal
26 issues as incidental to the equitable ones or by a court trial of a common issue existing
27 between the claims." *Ross v. Bernhard*, 396 U.S. 531, 537-38 (1970). Drafting in the
28 slipstream of *Dairy Queen*, the Ninth Circuit restated the rule: "[E]xcept under most

1 imperative circumstances, a right to a jury trial on legal issues may not now be denied to a
2 federal litigant . . . because the legal issues are 'incidental' to the equitable issues . . . ."
3 *DePinto v. Provident Sec. Life Ins. Co.*, 323 F.2d 826, 835-36 (9th Cir. 1963) (footnote
4 omitted).

5       The *Ramey* decision does not distinguish *Dairy Queen*.  Neither *Terry* nor *Woodell*
6 purports to revisit it; *Terry* simply noted that the plaintiffs could not call their damages
7 claims "incidental" because they sought no equitable relief at all.  The Ninth Circuit
8 continues to invoke *Dairy Queen* as good law.  *See, e.g.*, *Danjaq LLC v. Sony Corp.*, 263
9 F.3d 942, 962 (9th Cir. 2001); *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d
10 1023, 1027 (9th Cir. 1996).

11       Even if the legal claims are assumed to be incidental, the case at bar presents no
12 "imperative circumstances" that weigh against the use of a jury.

13       IT IS THEREFORE ORDERED that Defendants' Request for a Jury Trial (docs. #
14 88, 159) is granted.

15       DATED this 17th day of February, 2009.

_____
Neil V. Wake
United States District Judge