**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Don Addington; John Bostic; Mark Burman; Afshin Iranpour; Roger Velez; Steve Wargocki,<br><br>          Plaintiffs,<br><br>vs.<br><br>US Airline Pilots Association; US Airways, Inc.,<br><br>          Defendants.<br>_____ | No. CV 08-1633-PHX-NVW (consolidated)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW and ORDER** |
| Don Addington; John Bostic; Mark Burman; Afshin Iranpour; Roger Velez; Steve Wargocki, et al.,<br><br>          Plaintiffs,<br><br>vs.<br><br>Steven Bradford; Paul Diorio; Robert Frear; Mark King; Douglas Mowery; John Stephan, et al.,<br><br>          Defendants.<br>_____ | CV08-1728-PHX-NVW |

**TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 1 -

| | | | |
|---|---|---|---|
| II. | FINDINGS OF FACT | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 1 - |
| | A. | The Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 2 - |
| | B. | The Nicolau Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 4 - |
| | C. | The Formation and Election of USAPA . . . . . . . . . . . . . . . . . . . . | - 6 - |
| | D. | USAPA's Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 9 - |
| | E. | Furloughs of West Pilots . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 9 - |
| | F. | Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 10 - |
| III. | CONCLUSIONS OF LAW | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 11 - |
| | A. | Duty of Fair Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 12 - |
| | | 1. | Bargaining Backdrop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 13 - |
| | | 2. | Theory of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 16 - |
| | | 3. | Legitimate Union Objectives . . . . . . . . . . . . . . . . . . . . . . . | - 20 - |
| | | 4. | USAPA's Seniority Objective . . . . . . . . . . . . . . . . . . . . . . . | - 24 - |
| | | 5. | USAPA's Impasse-Related Objective . . . . . . . . . . . . . . . . . . | - 26 - |
| | | | i. | Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 26 - |
| | | | ii. | Non-persuasion . . . . . . . . . . . . . . . . . . . . . . . . . . | - 27 - |
| | | | iii. | Legal insufficiency . . . . . . . . . . . . . . . . . . . . . . | - 28 - |
| | | 6. | USAPA's Other Objectives . . . . . . . . . . . . . . . . . . . . . . . . . | - 30 - |
| | | 7. | Taxonomy of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 31 - |
| | B. | Subject Matter Jurisdiction and Ripeness . . . . . . . . . . . . . . . . . . | - 35 - |
| | | 1. | Ripeness Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 36 - |
| | | 2. | Remedial Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 37 - |
| | | 3. | Limitations Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 38 - |
| | | 4. | Other Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 39 - |
| | C. | Declaratory and Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . | - 42 - |
| | | 1. | Declaratory Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - 42 - |
| | | 2. | Availability and Propriety of Injunctive Relief . . . . . . . . . . . | - 43 - |

3.    Scope & Nature of Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . - 45 -

IV.    ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 49 -

-iii-

# I.    INTRODUCTION

Plaintiff pilots brought this suit on behalf of a class of similarly situated pilots formerly employed by America West Airlines.  They allege that their current union, the US Airline Pilots Association ("USAPA") breached its duty of fair representation.  The case was tried to a jury.  On May 13, 2009, the jury found in Plaintiffs' favor that USAPA had breached its duty by abandoning an arbitrated seniority list in favor of a date-of-hire list solely to benefit one group of pilots at the expense of another.  At the conclusion of the jury trial, a bench trial was held to determine the propriety, nature, and scope of any injunctive relief that would issue.  The Court will now award injunctive relief as supported by the following findings of fact and conclusions of law.  These findings are entered as required by Federal Rules of Civil Procedure 52(a) and 65(d), consistent with and supplementary to the facts already found by the jury in this case.  The nature and scope of relief depends upon the specific facts underlying liability.

# II.    FINDINGS OF FACT

This dispute arises out of a particularly fraught area of labor relations: the integration of pilot seniority lists upon the merger of two airlines.  From the perspective of the individual airline pilot, seniority is of the utmost importance.  Wages improve with a pilot's position on the seniority list.  So do working conditions.  Seniority gives pilots priority for bidding on work opportunities—the more senior the pilot, the better the choices.  Seniority impacts the rank a pilot may take, the aircraft a pilot may fly, and the control a pilot has over the work schedule.  Seniority also determines the availability of preferred routes and "domiciles"—the locales where pilots are based.  Seniority represents a significant investment of time in an industry where many pilots spend the bulk of their career at one airline.  Most importantly, a pilot's position on the seniority list creates or limits exposure to demotions and "furloughs," the airline industry's euphemism for layoffs.  Generally, the most junior pilots are furloughed first. Furloughed pilots enjoy a right of recall when hiring resumes, but until then they are out of work at the airline.

For all of these reasons, the process of combining two seniority lists during an airline merger raises stakes, emotions, and the risk of betrayal of principle to new heights. Such is the case here.

### A.    The Merger

In May 2005, two airlines, America West and US Airways, merged to become a single airline known as US Airways ("the Airline"). The America West pilots who were on the America West seniority list at the time of the merger are known as West Pilots. The US Airways pilots who were on the US Airways seniority list at that time are known as the East Pilots. As part of the merger, the two airlines planned to combine their operations into one, and as part of that process, the seniority lists of the two airlines would be integrated into a single list. As with any attempt to combine two separate seniority lists, this process pitted the seniority interests of the East Pilots against the seniority interests of the West Pilots. Any gain for one side would come at the expense of the other.

Adding tension was the comparative makeup of each pilot workforce. At the time of the merger and now, the East Pilots have been the bigger group: about 5100 pilots compared to about 1900 West Pilots. America West not only was the smaller of the two airlines, but it also was the younger. The 1900 West Pilots were generally hired within a more recent time frame than the East Pilots. The two groups differed in their wages and work status. The America West wages in place at the time of the merger were significantly more favorable than the US Airways wages. And all West Pilots were actively flying at the time of the merger, with hiring ongoing at the airline and a negligible history of furloughs. US Airways, on the other hand, found itself in the midst of bankruptcy proceedings with approximately 1700 of its pilots on furlough and no recall in sight. Many of the furloughed pilots had not flown for US Airways for years.

From the time of the merger until April 2008, both pilot groups were represented by one union: the Air Line Pilots Association ("ALPA"). The internal structure of ALPA played a central role in the seniority integration process. Two different Master Executive

Councils ("MECs") pursued the interests of each pilot group: the US Airways Master Executive Council ("the East MEC") and the America West Master Executive Council ("the West MEC"). The union members of each pilot group elected representatives who chose officers for their respective MECs. The MECs, in turn, appointed individuals to various union committees. For instance, the MECs each appointed individuals to a single Joint Negotiating Committee charged with negotiating collective bargaining terms with the Airline on behalf of both groups. The MECs also appointed individuals to separate standing Merger Committees. Each pilot group's Merger Committee consisted of two pilot Merger Representatives who would participate in the integration process for the two seniority lists. Under ALPA's structure, any new collective bargaining agreement ("CBA") would require ratification by a majority of pilots in each of the two pilot groups.

On September 23, 2005, ALPA and the two merging airlines entered into a Transition Agreement setting forth the process of achieving the operational integration of the two airlines. The chairman of each MEC signed the agreement, witnessed by other union officials. The Transition Agreement provides that until operations are combined, "[t]he pilot workforces of America West and US Airways will remain separate and covered by their respective collective bargaining agreements." With few exceptions, this status of separate operations places a fence between the former America West operations and the former US Airways operations so that pilots for one side cannot fly the other side's routes or aircraft.

The Transition Agreement requires three conditions to be met before operational integration can take place. First, an integrated seniority list must be created. Second, the union must conclude a single CBA for both pilot groups, incorporating the integrated seniority list. Third, the Airline must obtain a single FAA operating certificate, which it has done. Because no new CBA is in place, the Airline carries on in a state of separate operations. Efforts toward a new CBA have been complicated by the process of deciding what seniority list the CBA will include.

## B.    The Nicolau Award

The Transition Agreement also specifies how to integrate the two seniority lists: "The seniority lists of America West pilots and US Airways pilots will be integrated in accordance with ALPA Merger Policy and submitted to the Airline Parties for acceptance." In turn, ALPA Merger Policy [ex. 3, hereinafter cited as "MP"] provides a step-by-step process of integrating the lists. At the first stage, the parties attempt to negotiate a single list. [MP pt. 1.G.] If negotiations fail, a mediator is selected from a predetermined list through a series of strikes, and mediation ensues. [MP pt. 1.H.] If mediation fails, the mediator conducts a "final and binding" arbitration to arrive at a merged list, sitting as the chairman of a three-person arbitration board. [MP pt. 1.H.] Once the representatives conclude the process of integrating the seniority lists, the list is not subject to a separate ratification vote by the union membership. [MP pt. 1.D.] The integrated list is to be presented as part of any new CBA, however, which is subject to membership ratification.

In accordance with the Transition Agreement and ALPA Merger Policy, the Merger Representatives for the East and West Pilots began negotiating over seniority in August 2005. The circumstances of the two pilot groups prevented the two sides from reaching agreement. In particular, the East Merger Representatives thought that East Pilots were entitled to seniority rights based upon their dates of hire, including East Pilots who were on furlough at the time of the merger. The West Merger Representatives thought that these furloughees should be placed at the bottom of the list, with the remaining pilots merged into one list according to their relative positions on the original seniority lists for each of the merging airlines.

Failing to reach any negotiated compromise, the Merger Representatives began the next step of the ALPA Merger Policy process: mediation. By alternating strikes from the predetermined list of mediators, George Nicolau was selected as the mediator. Mediation took place in October 2006. Like negotiation, the mediation failed to produce an agreed-upon, integrated seniority list. The Merger Representatives then proceeded to the third

step of the ALPA Merger Policy process, entering into arbitration (the "Nicolau Arbitration") with George Nicolau presiding along with two non-voting pilot representative from other airlines, one designated by each pilot group. The arbitration proceedings began in December 2006 and concluded in February 2007.

The Nicolau Arbitration panel issued its award (the "Nicolau Award") in the first week of May 2007. The award struck a compromise between the requests of both sides. It placed about 500 senior East Pilots at the top of the list, against the wishes of West Pilots, because of their special experience with wide-body international aircraft that America West was not operating before the merger. It placed approximately 1700 East Pilots who had been furloughed at the time of the merger at the bottom of the list because of their greatly diminished career expectations. Then it blended the remainder of the East Pilot list with the West Pilot list generally according to the relative position of the pilots on their original lists.

Before, during, and after the arbitration, both sides understood that any arbitrated result would be final and binding as provided in ALPA Merger Policy, and that the Transition Agreement required implementation of the Nicolau Award along with any new single CBA. Each side presented exhaustive proof in support of its case over the course of 18 days of hearings, with 20 witnesses and 14 volumes of exhibits. They filed comprehensive post-hearing briefs. There is no persuasive evidence that any East or West Pilot doubted the finality of the arbitration before it took place.

The Nicolau Award caused outrage among many East Pilots. The East Merger Representatives sought to have the award overturned and petitioned ALPA to revisit it. Emotions flared for weeks and months to follow while ALPA attempted to broker a compromise between the two pilot groups. Understanding that ratification of any single CBA by both pilot groups was essential, ALPA's Executive Council passed a resolution on May 24, 2007, urging both MECs to "explore consensual approaches that promote career protection and mutual success, and achieve an acceptable single [CBA] that improves pay, benefits, work rules, and job security for both pilot groups." Further

efforts at compromise took place at certain union-organized conferences over the summer. No compromise resulted.

While the arbitration was pending, negotiations with the Airline progressed. In May 2007, the ALPA Joint Negotiating Committee received a comprehensive CBA proposal from the Airline known as the Kirby proposal. [Ex. 98.] While the union and the Airline remained far apart on many terms of employment, this proposal represented significant progress in negotiations and included a pay increase for both pilot groups worth $122 million per year. The West Pilots' increase was modest, but the introduction of equal pay for both pilot groups would mean a pay increase for East Pilots worth $108 million per year. This proposal has remained on the table.

On August 15, 2007, the East MEC withdrew its representatives from the Joint Negotiating Committee. This tactic halted negotiations between the union and the company toward a single new CBA. By October 1, 2007, the ALPA Executive Council had determined that there were no grounds under ALPA Merger Policy for setting aside the Nicolau Award. ALPA's president criticized the East MECs actions and stated that it was "time for the [East] MEC to comply with its representational and legal obligations under the Constitution & Bylaws, ALPA Merger Policy, the Transition Agreement, and implementing resolutions of the Executive Council" and "adopt a resolution . . . reversing all prior efforts to bar or precondition the continuation of joint negotiations." [Ex. 19.]

The East MEC never returned to negotiations. ALPA submitted the Nicolau Award to the Airline in late 2007. The Airline accepted the award on December 20, 2007, as it was required to do if the award complied with certain basic requirements of the Transition Agreement.

## C.    The Formation and Election of USAPA

Another story was unfolding during this course of events. On May 16, 2007, shortly after the issuance of the Nicolau Award, East Pilot Stephen Bradford wrote a letter to the ALPA Executive Board announcing his intent to leave ALPA. He voiced hostility to the Nicolau Award, claiming that he did not want to leave the union but that

the Nicolau Award left him little choice.  In his view, it was necessary to leave in order to "write our own merger policy into our bylaws" and "just to protect what little we [East Pilots] have left." [Ex. 107 at 1-2.]  He asserted that the East Pilots' majority status in the union would enable them  to achieve their aims.  He and other East Pilots formed a committee to explore how to prevent implementation of the Nicolau Award by forming and certifying a new union with a different seniority objective.  They received advice from a lawyer to take care with "the language you use in setting up your new union" and not to "give the other side a large body of evidence that the sole reason for the new union is to abrogate an arbitration." [Ex. 14.]

Mr. Bradford and other East Pilots proceeded to form Defendant USAPA.  On August 10, 2007, they announced that they held nearly enough popular support to force a representation election.   On November 29, 2007, the National Mediation Board certified a representation election.  USAPA's campaign purported to address other areas of pilot discontent, but it communicated a clear message to East Pilots that its seniority policy would be more favorable to them than the Nicolau Award.  USAPA promised that as certified bargaining representative, it would negotiate for a date-of-hire seniority integration rather than the Nicolau Award.  Many West Pilots opposed the campaign, and ALPA objected to the East MECs "failure to respond to and defend against" it.  [Ex. 19.] USAPA won the election, and the National Mediation Board certified USAPA as the East and West Pilots' collective bargaining representative on April 18, 2008, with Mr. Bradford as its president.

Five months later, USAPA adopted and presented to the Airline its own seniority proposal.  This proposal constructs a seniority list based upon each pilot's date of hire, with West Pilots generally falling to the bottom of the list.  The proposal also includes certain conditions and restrictions providing limited protection to West Pilots.  For example, it provides that reductions in the number of captain positions would be shared between the two pilot groups on a pro rata basis.   Also, West Pilot positions in existence on June 1, 2008, are protected such that East Pilots cannot bid into those positions.  But

significant limitations attend these protections. First, they expire after ten years. Second, a West Pilot "forfeit[s] his/her right with respect to all protected position provisions" if he or she fails to bid on or accept an available protected position or bids on a non-protected position. Third, the date-of-hire list supersedes all conditions and restrictions, including the pro rata allocation of position reductions, in the event of a catastrophic reduction of 25% or more of the total number of pilot positions. Finally, all furloughs and recalls still are implemented "on an integrated [date-of-hire] seniority list basis" regardless of protected position provisions.

Taking all of the conditions and restrictions into account, the Court finds that the terms of USAPA's seniority proposal are substantially less favorable to West Pilots than the Nicolau Award. The ten-year period of conditions and restrictions provides some protection to West Pilots, but once that period expires, even assuming rapid attrition of senior East Pilots, the West Pilots find themselves with diminished career opportunities relative to their position on the Nicolau List. More importantly, USAPA's proposal exposes the West Pilots to grave new economic perils. Any furlough will take a disproportionate toll on West Pilots, as will any catastrophic reduction in force—both realistic possibilities. At the time of the merger, 33% of East Pilots were on furlough status, a number roughly corresponding to 24% of the merged pilot workforce and 89% of the West Pilot workforce. If the very circumstances at the time of the merger were to recur under USAPA's seniority proposal, many of the West Pilots would lose their jobs to now-working East Pilots who were unemployed at the time of the merger. While all of these factors support the finding, they are not all necessary. The sole fact that USAPA's seniority proposal disfavors West Pilots for furlough purposes compels, on its own, the conclusion that the proposal is far less favorable to West Pilots than the Nicolau Award. *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 796, 800 (7th Cir. 1976).[1]

---

[1] USAPA also argues that the minimum fleet requirements of the Transition Agreement prevent any further significant furloughs. This argument has little force because

The Airline has received USAPA's seniority proposal but has not responded to it. USAPA and the Airline continue to negotiate toward a new CBA. Any new CBA is now subject to USAPA's ratification process, which differs from ALPA's. Under USAPA's constitution, ratification requires a majority vote of the entire union membership, not separate votes of the two pilot groups. This system deprives both pilot groups of their separate veto powers.

### D. USAPA's Objectives

USAPA's sole objective in adopting and presenting its seniority proposal to the Airline was to benefit East Pilots at the expense of West Pilots, rather than to benefit the bargaining unit as a whole. Its constitution includes a commitment "to maintain uniform principles of seniority based on date of hire and perpetuation thereof, with reasonable conditions and restrictions to preserve each pilot's un-merged career expectations." USAPA officers have promised to "overturn" the Nicolau Award, and USAPA considers itself constitutionally bound never to implement it. Counsel for USAPA concedes that the union will never do so. [Doc. # 574 at 1047.]

As explained below, other motivations USAPA presented at trial were insufficient as a matter of law to justify its course of action. Some were simply pretextual.

### E. Furloughs of West Pilots

Continuing in a state of separate operations, economic forces have caused the Airline to reduce flying. Most of these reductions have occurred in the western operations. As a result, the Airline has announced plans to furlough 300 pilots, including approximately 175 West Pilots. The Transition Agreement generally prevents East and West Pilots from flying in the other group's operations, so furloughs take place in the locales where flying is reduced, according to the two separate seniority lists.

---

USAPA's integrated seniority proposal only goes into effect when operations are integrated after the conclusion of a single new CBA, which may or may not have its own fleet requirements. The fleet requirements of the Transition Agreement are expressly limited to the period of separate operations. [Ex. 21, at II.B.]

Approximately 140 West Pilots had been furloughed by the time of trial. The group of presently furloughed pilots includes Plaintiff Worgocki, Plaintiff Bostic, and Plaintiff Iranpour. If a single CBA that incorporated the Nicolau Award were in place and operations integrated, none of the West Pilots would be furloughed at this time.

## F. Procedural History

On September 4, 2008, in response to USAPA's actions, six individual West Pilot Plaintiffs brought this action against USAPA and the Airline alleging that USAPA had breached its duty of fair representation and that the Airline had breached a CBA. The complaint sought damages as well as injunctive relief. Plaintiffs also moved for a preliminary injunction to restrain the Airline from furloughing West Pilots ahead of East Pilots who had been on furlough at the time of the merger. The Court granted the Airline's motion to dismiss for failure to exhaust administrative remedies. It denied USAPA's motion to dismiss the fair representation claim under Fed. R. Civ. P. 12(b)(1) and (6); that claim is the subject of this trial.

Around the same time, Plaintiffs also filed a state court action on behalf of a class of West Pilots against a class of East Pilots. This complaint alleged various state law causes of action against the East Pilots. After removal and consolidation, the state-law causes of action were dismissed as preempted by the Railway Labor Act.

On November 21, 2008, trial in the fair representation case was accelerated and bifurcated into two stages to expedite resolution of this urgent case. The first stage would address the liability of the union and the propriety of injunctive relief. In the event of a verdict finding USAPA liable, the second stage would address the causation and quantification of any damages owed to Plaintiffs. Trial on liability was set to occur no later than February 17, 2009. One week after trial was set, Plaintiffs filed an amended complaint in the fair representation action, specifying that the suit was brought on behalf of a class of similarly situated West Pilots. Because of the surprise to USAPA and the need for class discovery, trial was continued. Briefing followed on certification as well as the right to a jury trial. The Court certified the class of West Pilots and granted USAPA's

request for a jury trial under the Seventh Amendment.  The Ninth Circuit denied USAPA's request for interlocutory review of the certification order.  Because the class was not certified as to Plaintiffs' compensatory damages claims, the jury trial right attached only to the damages claims of the six individual Plaintiffs.[2]  A jury trial would nonetheless be held at the liability stage because the damages claims would hinge on the adjudication of liability.

On March 3, 2009, shortly before the class was certified, a new trial date was set. Over USAPA's objection, trial on the liability facts and injunctive relief would now take place beginning April 28, 2009.  The parties proceeded to and through trial according to plan.  The jury retired after approximately nine days of evidence and returned a verdict for Plaintiffs.  Bench proceedings then were held respecting the propriety and scope of injunctive relief.  No new evidence was introduced at the bench trial beyond that presented to the jury.[3]

## III.    CONCLUSIONS OF LAW

"In chasing down the myriad arguments of the parties, [the Court has] pursued both the fox of enlightenment and the hare of obfuscation through the bramble of labor law."  *Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 609 (1st Cir. 1987).  The First Circuit wrote those words about a contentious union seniority case, and the same sort of chase has occurred here.  While neither side has refrained from taking dubious legal positions, USAPA has at various stages misstated law, facts, and procedural history, with frequent recourse to the "contradiction or confusion . . . produced by a medley of

---

[2] Plaintiffs' motion to certify the class also referred to a class-wide refund of union dues and fees.  USAPA's Motion for Judgment on the Pleadings was granted as to this claim.

[3] Plaintiffs offered new testimony of Brian Stockdell regarding certain Airline logistics but withdrew the request for relief for which it was offered.  Therefore, this withdrawn testimony is not considered and has no effect upon the present order.  Cross-examination of Stockdell was not permitted when USAPA could not state any purpose for cross-examining other than to refute his withdrawn testimony concerning the withdrawn remedy.

judicial phrases severed from their environment." *Guaranty Tr. Co. of N.Y. v. York*, 326 U.S. 99, 106 (1945) (Frankfurter, J.).  It is therefore necessary to cut a path through much labor law bramble on the way to granting relief.  First, this Order explains the theory supporting liability.  Second, it reaffirms and elaborates upon the subject matter jurisdiction and ripeness, best understood in light of the merits.  Third, it outlines the propriety, scope, and nature of relief granted.

### A.    Duty of Fair Representation

A jury has already found that USAPA breached its duty of fair representation with respect to the West Pilots.  In short, USAPA violated the duty because it cast aside the result of an internal seniority arbitration solely to benefit East Pilots at the expense of West Pilots.  USAPA failed to prove that any legitimate union objective motivated its acts.

In general, a union owes a duty of fair representation to all members of the bargaining unit it represents.  *McNamara-Blad v. Ass'n of Prof'l Flight Attendants*, 275 F.3d 1165, 1169 (9th Cir. 2002).  This duty "arises from a union's statutory role as the exclusive bargaining representative for a unit of employees"; it attaches only at the time that a union becomes certified as the exclusive bargaining representative for the bargaining unit.  *See id.* at 1169-71.  The duty has evolved as a judicial check on the union "to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law."  *Id.* at 1169 (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)).

"Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  *Vaca*, 386 U.S. at 177.  Put another way, the duty prohibits unions from acting in a way that is "arbitrary, discriminatory, or in bad faith."  *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007) (quoting *Vaca*, 386 U.S. at 190).

**1.    Bargaining Backdrop**

"The integration of a seniority list is a difficult undertaking because of the inevitability that some individual employees will be disadvantaged in comparison to others.  In these circumstances, a union does not breach its duty of fair representation to others as long as it proceeds on some reasoned basis." *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir. 1990).  For this reason, ALPA had established an internal procedure for the integration of seniority lists in the merger scenario.  *Bernard v. Air Line Pilots Ass'n, Int'l*, 873 F.2d 213, 217 (9th Cir. 1989); *see also Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1107 (2d Cir. 1991).

The Nicolau Arbitration was intended to provide a conclusive resolution of the conflicting seniority interests of the East Pilots and the West Pilots.  The Transition Agreement generally required the parties to follow ALPA Merger Policy to integrate the seniority lists.  The parties bound by that agreement included the union "by and through the Master Executive Councils of the America West and US Airways pilots."  Both MEC chairmen signed the agreement with the ALPA President, witnessed by other union officials.

ALPA Merger Policy (cited as "MP") provided for the procedures leading up to and resulting in the issuance of the Nicolau Award.  It also dictated the award's significance.  "The purpose of arbitration shall be to reach a fair and equitable resolution consistent with ALPA policy." [MP § 1.H.I.b.] "The Award of the Arbitration Board shall be final and binding on all parties to the arbitration and shall be defended by ALPA." [MP § 1.H.5.] "The merged seniority list will be presented to management and ALPA will use all reasonable means at its disposal to compel the company to accept and implement the merged seniority list." [MP § 1.I.1.]  "The arbitration award issued after proceedings under [the Merger Policy] shall be the position of ALPA with management . . . ." [MP § 1.I.7.]  The Policy Compliance provision states that "[a]ny attempt by a member or members of ALPA to obtain an agreement which would operate to frustrate the objectives

of this policy shall be considered an act contrary to the best interests of ALPA and its members." [MP § 3.C.]

USAPA does not dispute that it succeeded to ALPA's rights and obligations under the Transition Agreement. Nonetheless, USAPA contends that the Nicolau Award does not limit USAPA in any sense. USAPA relies heavily on the following stipulation: "The parties to the Nicolau Arbitration were stated to be 'the US Airways Pilot Merger Representatives and the America West Pilot Merger Representatives.'" USAPA suggests that the Nicolau Award bound only the merger representatives, with the sole effect of precluding those representatives from asserting the existence of any disagreement between them regarding the Nicolau Award. The award, according to USAPA, was imposed on the East Pilots without their consent; ALPA, and by extension USAPA, remained free to order its affairs as though the award had never happened.

This argument offends common sense, the evidence, and fundamental principles of law. In the context of labor rights, it is both discordant and irrelevant. Generally, properly appointed representatives acting within the scope of their authority do bind those they represent. ALPA Merger Policy provides that the Merger Representatives "shall have complete and full authority to act for and on behalf of the flight deck crew members of their respective airlines for the purpose of concluding a single flight deck crew member seniority list, which shall not be subject to ratification." [MP § 1.D.3.] This is not a dispute about the personal contractual obligations of East Pilots.[4] The East Pilots took on the benefits and burdens of ALPA's representative actions when they elected to be represented by that union. They gave their political consent to the actions of the merger representatives when they elected the East MEC that appointed them. *Cf. Ackley v. W. Conference of Teamsters*, 958 F.2d 1463, 1478 (9th Cir. 1992) (explaining that unions exist and take action subject to union members' voting rights); 45 U.S.C. § 152 Fourth

---

[4] As already noted, Plaintiffs' parallel suit alleging state law claims against a putative class of East Pilots was dismissed as preempted by the statutory duty of fair representation.

(protecting a bargaining unit's right to choose a union by majority vote).  The East Pilots and ALPA were therefore bound, in the legislative sense of collective bargaining, by ALPA's Transition Agreement commitment "by and through" the East MEC to follow ALPA Merger Policy in merging the seniority lists.  *See Humphrey v. Moore*, 375 U.S. 335, 337-38, 347-48 (1964) (holding that union discharged its duty of fair representation by resolving a seniority dispute in accordance with negotiation and arbitration procedures of a CBA negotiated by a multi-local union and executed by each appropriate local union).

Although the Court finds that the unambiguous language of the Transition Agreement resolves the question on its own, the East MECs course of conduct during and after the Nicolau Proceedings confirms that the award was intended to be "final and binding" as to the two pilot groups.  USAPA presented no evidence that the East MEC or any East Pilots regarded the Nicolau Arbitration as an academic exercise before or while it took place.  To the contrary, the East Pilots exhibited a solemn resolve to make their case.  Both sides presented voluminous economic evidence over the course of several weeks of hearings.  The East MEC pressed hard to have the award overturned within the ALPA framework.  Finally, the East MEC attempted to subvert the award's implementation by withdrawing from merger negotiations altogether.  Rather than cast doubt on the final and binding nature of the award, these actions show that from the East MECs perspective, the award was most final and most binding.  ALPA's attempts to negotiate a compromise between the two pilot groups do not belie the award's finality; those attempts reflect an understanding that the West Pilots, through the West MEC, were entitled to sit on their rights.  At no time did ALPA assert the power to impose a different seniority proposal on the West Pilots without their consent.

The award shapes USAPA's duty here even though the Transition Agreement could be amended by mutual agreement of the union and the Airline.  US Airways has already accepted the Nicolau seniority list, and the evidence shows no reason for amendment other than USAPA's internal purposes.  As explained further on, amendment

needs some legitimate union objective.  Amendment is not a sufficient purpose unto itself, a kind of union wild card that covers for any purpose, good or ill.  The power of amendment does not trump the union's duty of fair representation; it must serve it.

## 2. Theory of Liability

In general, a union meets its duty of fair representation as long as its actions fall within a "wide range of reasonableness." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78 (1991).  This latitude includes a right on the part of the union to change bargaining positions midstream.  *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 800 (7th Cir. 1976).  There is nothing intrinsically wrong with bargaining for seniority integration based upon the date of hire; date-of-hire seniority is "generally . . . an equitable and feasible solution" to the problem of merging seniority lists.  *Truck Drivers, Local Union 568 v. NLRB*, 379 F.2d 137, 143 n.10 (D.C. Cir. 1967); *see also Laturner v. Burlington N., Inc.*, 501 F.2d 593, 598-603 (9th Cir. 1974). Seniority rights do not "vest" with the union members in any proprietary sense.  *See Hass v. Darigold Dairy Prods. Co.*, 751 F.2d 1096, 1099 (9th Cir. 1985).  Even when an internal union arbitration resolves a seniority dispute, it is not necessarily improper for a union to pursue an alternative outcome.  *Associated Transport, Inc.*, 185 NLRB 631, 635 (1970) (unfair labor practice case).

USAPA clings to these generalities, but they give no protection here.  The question is not whether USAPA made a seniority proposal that is acceptable in the abstract, or whether USAPA deprived certain employees of their property rights, or what position it could have taken before agreement to a different final and binding process.  The question is not whether USAPA has the right to adjust its bargaining position, even after playing out an agreed final and binding process, for some good reason.  The legal question is whether USAPA—or any union—violates its duty of fair representation by adopting and promoting a certain integrated seniority list for no reason other than to favor one group of employees at the expense of another.  An established genre of fair representation decisions says yes.

The first is *Bernard v. Air Line Pilots Association, International*, which concerned the merger of Alaska Airlines and Jet America, Inc. 873 F.2d 213 (9th Cir. 1989). ALPA was the certified bargaining representative for all Alaska Airlines pilots, but the Jet America pilots were not members of the union. *Id.* at 214. Nonetheless, ALPA owed a duty of fair representation to the Jet America pilots. *Id.* at 216. When it came time to integrate the seniority lists of the two airlines, ALPA did not follow its own policy, namely the process of negotiation, mediation, and, if necessary, arbitration. *Id.* at 215. The employer excluded all Jet America pilots from seniority negotiations. *Id.* The Jet America Pilots succeeded in their fair representation action because they had been excluded from negotiations and because ALPA did not follow its own policy. *Id.* at 216-17. The court rejected the union's purported justifications for its actions: that it was reasonable to "speak[] to management as one voice," that the union's seniority decisions were consistent with the respective career expectations of the pilot groups, and that ALPA's duty to the Jet America Pilots was no broader than its general duty to the pilot group as a whole. *Id.* ALPA had disregarded its neutral merger policy to discriminate against the previously non-unionized pilots. *Id.* at 217. Indeed, at the time of the seniority negotiation, ALPA's president had disclaimed any duty to the Jet America pilots. *Id.* Under *Bernard*, a union may not diverge from its merger policy solely to advance the seniority rights of union members at the expense of non–union members. *Id.*

A similar rule finds expression in *Truck Drivers, Local Union 568 v. NLRB*, 379 F.2d 137 (D.C. Cir. 1967).[5] *Truck Drivers* holds that a union's fulfillment of its promise to "renounce[] any good faith effort to reconcile" the seniority interests of two employee groups would lead to a violation of its duty of fair representation. *Id.* at 142-43. Of particular relevance was the union's sole motivation to "win[] an election by a promise of preferential representation to the numerically larger number of voters." *Id.* at 143; *see*

---

[5] *Truck Drivers* concerned allegations of unfair labor practices, but the Board's imposition of liability was affirmed with reference to standards of fair representation.

*also Hardcastle v. W. Greyhound Lines*, 303 F.2d 182, 186-87 & n.10 (9th Cir. 1962) (affirming grant of summary judgment for defendants in fair representation claim because plaintiffs failed to show a lack of "discriminatory action in favor of one politically stronger local or faction of the union against a politically weaker local or faction"); *Associated Transport*, 185 NLRB at 635 (union may not revisit seniority for improper purpose).

The Seventh Circuit has embraced the same principle. In *Barton Brands*, two seniority lists were dovetailed, that is, combined on a date-of-hire basis, upon the merger of two companies. 529 F.2d at 795-96. Layoffs began, and the larger of the two merged workforces decided that the existing seniority integration was unfair. *Id.* at 796. The union formulated a new proposal that dovetailed the two lists for most purposes, but placed the smaller workforce at the bottom of the list for layoff purposes. *Id.* A majority of the union membership ratified the new arrangement. *Id.* The union met judicial rebuke. Abridging "the established seniority rights of a minority of the Barton employees . . . for no apparent reason other than political expediency" constituted an unfair labor practice reflective of fair representation doctrine. *See id.* (citing *Hargrove v. Bhd. of Locomotive Engineers*, 116 F. Supp. 3 (D.D.C. 1953) (fair representation case)). On remand, the Board was instructed "that in order to be absolved of liability the Union must show some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority." *Id.*

The Seventh Circuit has reaffirmed this theory of liability, addressing USAPA's very posture in dictum. In *Air Wisconsin Pilots Protection Committee v. Sanderson*, 909 F.2d 213 (7th Cir. 1990) (Posner, J.), two airlines merged, and both pilot groups were represented by ALPA. ALPA followed its merger policy and the seniority integration issue went to arbitration. *Id.* at 215. "The arbitrators split the difference," giving each group of pilots less than it had asked for. *Id.* Some pilots from one of the merging airlines "tried to replace ALPA as a collective bargaining representative . . . with a newly created union" but they were outvoted. *Id.* When the MEC for the disgruntled pilot

group proposed replacing the arbitrated list with a list based on length of service—a proposal corresponding to their position before the arbitration panel—ALPA placed the MEC in trusteeship. *Id.* at 216. Then, as now, ALPA MECs may be placed in trusteeship if they fail to comply with ALPA's Constitution, By-Laws, or representational obligations. *Id.* at 215.

The disgruntled pilots brought a fair representation suit, and its dismissal was affirmed. The court reasoned that the arbitration process was fair and the arbitrators' award definitive under ALPA policy. *Id.* at 216. "If ALPA were free to ignore the merged seniority list, the employees of the post-merger airline would have very little job security" and "disputes over seniority would fester—as they have done in this case." *Id.* In a concluding dictum, the court noted that "an attempt by a majority of the employees in a collective bargaining unit to gang up against a minority of employees in the fashion apparently envisaged by plaintiffs," that is, by "ousting ALPA in favor of a union not pledged to defend the arbitrators' award [,] . . . could itself be thought a violation of the duty of fair representation by the union that the majority used as its tool." *Id.* at 217.

In *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir. 1992), ALPA was allowed to depart from its Merger Policy and to change its negotiating position midstream by promoting a seniority list that favored the preference of a majority of the employees in the bargaining unit. *Rakestraw* did not abandon or undercut the rule that a union may not reshuffle a seniority list for improper reasons. To the contrary, it reaffirmed *Barton Brands*, holding that "a union may not juggle the seniority roster for no reason other than to advance one group of employees over another," and it cited *Air Wisconsin* without criticism. *Rakestraw*, 981 F.2d at 1530, 1533, 1535. There was no breach of duty where no ill motive existed or where ALPA acted, at least in part, to "rationally promote the aggregate welfare of employees in the bargaining unit" by pursuing "two rational and appropriate objectives" without discrimination between different groups of employees. *Id.* at 1535.

The influence of *Barton Brands* extends well beyond the Seventh Circuit. The Second Circuit follows its holding. *See Ramey v. Dist. 141, Int'l Ass'n of Machinists*, 378 F.3d 269, 277 (2d Cir. 2004). So too does the First Circuit. *See Teamsters Local Union No. 42 v. NLRB*, 825 F.2d 608, 611 (1st Cir. 1987).[6] "Union members are to be accorded equal rights, not subjugated arbitrarily to the desires of a 'stronger, more politically favored group . . . .'" *Id.* (quoting *Barton Brands*, 529 F.2d at 799) (alterations original).

### 3. Legitimate Union Objectives

The question then arises, what kind of justification can the union rely upon to avoid liability? USAPA has advanced a broad reading of *Rakestraw* under which any rational relation to a legitimate union objective will suffice, regardless of the union's actual motives. Plaintiffs, on the other hand, proposed an alternate view where the court would evaluate a union's primary motive for the actions it takes. Neither approach is reflected in the case law. Liability attached because USAPA's only actual motivation in adopting and presenting its seniority proposal was to benefit East Pilots at the expense of West Pilots.

Union liability for discrimination or bad faith requires a subjective examination of the union's actual motives and purposes. *Simo v. Union Needletrades, Indus. & Textile Employees, Sw. Dist. Council*, 322 F.3d 602, 618 (9th Cir. 2003). *Rakestraw* consones to this rule, resting not on hypothetical connections to legitimate union objectives, but rather on the actual reasons the union had for choosing its course of action. 981 F.2d at 1532. That case took up two fact situations addressing the same legal issue. In the first, a larger airline acquired a smaller airline. *Id.* at 1526. ALPA disregarded its Merger Policy in the process of integrating the seniority lists, and the smaller pilot group acquiesced in the result—a date-of-hire list favoring the majority. *Id.* at 1527. Later, the minority brought suit against the union. *Id.* The union was held to be in pursuit of a legitimate objective

---

[6] Like *Truck Drivers*, this unfair labor practices case relies upon fair representation principles.

because the larger, acquiring airline did not need the smaller group of pilots and was unlikely to agree to any arrangement disfavoring its own pilots. *Id.* at 1533. Moreover, "there [was] no evidence that ALPA's leaders had it in for the [smaller pilot group]." *Id.* at 1527.

In the second *Rakestraw* situation, ALPA was in the process of negotiating a post-merger CBA, including a date-of-hire seniority list. *Id.* at 1527. Negotiations broke down and the pilots went on strike. *Id.* at 1528. In response, the airline employer hired 219 replacement pilots. It also hired 320 student pilots who did not begin work during the strike. *Id.* At the same time, almost all 570 striking pilots honored the picket line. *Id.* After the strike, no CBA was in place, and ALPA had no alternative but to accept the airline's proposed seniority list with strike-breakers and student trainees at the top of the list. *Id.* at 1528-29. The striking pilots, constituting a majority in the union, made aggressive protest. *Id.* at 1529. Ultimately, management and the union agreed to put the 570 striking pilots at the top of the list according to date of hire, above the 219 strike-breakers and the 320 student pilots. *Id.* The strike-breakers brought a fair representation claim. *Id.*

The union "detested" the strike-breakers and "[t]his loathing played a role in the union's efforts to increase the seniority of the Group of 570." *Id.* Nonetheless, ill will or a desire for retribution does not "spoil an agreement that rationally serves the interests of labor as a whole, and that treats employees who are pariahs in the union's eyes no worse than it treats similarly situated supporters of the union."[7] 981 F.2d at 1532, 1535. Critical to the court's reasoning was that "ALPA had at least two rational and appropriate objectives" satisfying the rule of *Barton Brands*. *Id.* at 1535. It wanted to harm the strike-breakers, and it also sought to restore the seniority of the 570 pilots that it had defended before the strike. By punishing employees who crossed the picket line, the

---

[7] Analogizing to the legislative sphere, the court stated, "A discriminatory motive without a discriminatory rule does not condemn a statute." *Rakestraw*, 981 F.2d at 1532.

union could "strengthen the hand of organized labor in future conflicts with management," in effect "shor[ing] up the monopolistic quality of organized labor." *Id.* By acting to restore a seniority system vis-a-vis newly hired pilots, the union served the legitimate objective of "stability" by protecting long-term employee expectations against outright erasure. *Id.* (citing *McCann v. City of Chicago*, 968 F.2d 635 (7th Cir. 1992) (equal protection case) and *Nordlinger v. Hahn*, 505 U.S. 1 (1992) (same)). No holding of *Rakestraw* precludes liability for discriminatory or bad faith action when a union's sole motivation is improper.

In *Ramey v. District 141, International Association of Machinists*, the Second Circuit considered *Rakestraw*'s statement that "[a] rational person could conclude that dovetailing seniority lists in a merger . . . serves the interests of [the union membership] as a whole." 378 F.3d 269, 277 (2d Cir. 2004) (alterations original). The *Ramey* court distinguished between a bare challenge to union action and a challenge to union action with evidence of an improper purpose. "Unlike in Rakestraw," where the first fact pattern presented no evidence of hostility in merging seniority lists on a date-of-hire basis, "plaintiffs here do not suggest that [the union] acted improperly merely by dovetailing the seniority lists." *Id.* "Rather, they argue that [the union] was motivated by retaliatory animus in choosing which seniority dates to apply." *Id.* Liability attached because the alteration of seniority based solely on retaliatory animus was not objectively reasonable. *Id.* Once the jury rejected the union's purported neutral motivation as pretext, it could conclude that hostile motives alone motivated the union action. *Id.* at 284. A rational relation to purportedly neutral purposes could not defeat liability where the only actual motive was improper. *Id.*[8]

---

[8] *Ramey* imposed liability because the union was motivated to punish employees who had been affiliated with another union. These employees had also refused to participate in a strike. *Ramey* does not address *Rakestraw*'s holding that punishing strike-breakers is a legitimate union objective, and that issue is not before the Court.

For these reasons, the jury in this case was instructed as follows: "Even if the union's conduct could be rationally related to a legitimate union objective, the union can be liable for violating its duty of fair representation if its actions are shown to be solely motivated by objectives that are not legitimate union objectives." To the extent USAPA reads a stronger rule into *Rakestraw*, a rule that would validate all union conduct that could be rationally related to legitimate union objectives irrespective of actual motive, USAPA's reading is rejected and would not be persuasive if accepted because it runs against the scheme of fair representation doctrine already discussed, including Ninth Circuit precedent. *See Rakestraw*, 989 F.2d 944, 945-48 (7th Cir. 1993) (Ripple, J., dissenting from denial of rehearing *en banc*) (interpreting the panel decision in this strong manner and arguing that it violates Supreme Court and Seventh Circuit precedent); *Bernard*, 873 F.2d at 216-17 (looking beyond plausibly rational basis to actual union motive); *Simo*, 322 F.3d at 618 (requiring this inquiry in the Ninth Circuit); *Associated Transport*, 185 NLRB at 635 (examining actual union motive). USAPA's proposed rule would collapse "bad faith" and "discrimination" into an arbitrariness inquiry that does not apply. *See Beck v. United Food & Comm. Workers Union, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007).

Conversely, this Court rejected the Plaintiffs' suggestion that a bad motive combined with a good motive could still produce liability where the bad motive predominates. *See Rakestraw* 981 F.2d at 1534 (rejecting mixed-motive liability); *Ramey* 378 F.3d at 284 (relying upon a showing of pretext); *Barton Brands*, 873 F.2d at 217 (noting that ALPA acted solely on the basis of union membership). It may be possible and desirable to fashion a framework for adjudicating mixed-motive fair representation cases, but Plaintiffs cite nothing allowing this Court to thus better the precedents. Regardless, the jury found that only an improper motive, and no proper motive animated USAPA's seniority agenda.

## 4.    USAPA's Seniority Objective

There is no merit to USAPA's argument that the pursuit of date-of-hire seniority principles automatically legitimates USAPA's actions because date-of-hire seniority is "the gold standard" of integration methods. [Doc. # 482, at 1902.]   The jury was instructed that "[i]n this case, a general preference for any particular seniority system other than the Nicolau Award, standing alone, is not a legitimate union objective." USAPA's argument is little more than a circular rationalization for its departure from the Nicolau Award to favor the majority.  The Nicolau Arbitration occurred on the premise that insisting in advance on one seniority system or another could not reconcile the interests of the two pilot groups.  The decision to follow a given seniority philosophy in this case could always be viewed as politically motivated by the interests of one pilot group or the other.  Fairness could be found only in an agreed procedure, not in an agreed outcome.  The Transition Agreement and the Nicolau Arbitration provided USAPA with a "final and binding" internal compromise.  The union no longer lacked an appropriate resolution of these irreconcilable interests.

There is no authority for a magic rule that date-of-hire stops all inquiry on the duty of fair representation, in disregard of circumstances.  The significance of date-of-hire seniority varies from one labor negotiation to the next.  The bankrupt position of US Airways at the time of the merger, with almost as many furloughed pilots as America West had working, and with a significant furlough history, lent date-of-hire integration some hues of inequity it might not have had in another merger.   The question before the arbitrator was not whether date-of-hire seniority, in the abstract, was a desirable thing, but whether it would provide a fair and equitable answer to the career expectations of the unmerged pilot groups.

USAPA has maintained from the beginning that no union has ever faced liability based on the pursuit of date-of-hire principles.[9] *Ramey* refutes this in its holding. 378 F.3d at 274-75.[10] The union in *Ramey* was liable, notwithstanding its date-of-hire list, because it drew up that list so as to punish inimical employees. *Id.* A date-of-hire proposal does not immunize or condemn union action; the policy preference is generally permissible. It is the manipulation of the seniority proposal in context that gives rise to the claim. USAPA's date-of-hire agenda is just a means of changing the arbitrated outcome for no purpose other than to favor the majority.

USAPA concedes the broad sweep of its argument, which implies that the Railway Labor Act does not permit "hopelessly irreconcilable labor groups to enter into a binding neutral process to resolve their mutual disagreement so they can go forward on their areas of mutual interest." [Doc. # 574, at 1071 (question from the Court).] To agree with this conclusion would dismantle the framework of honest intentions and fair dealing, of stability and consistency, that is the premise of all bargaining, not less labor negotiations. To this extent—an extent as limited and minimal as it is important—the Nicolau Award constrains USAPA as a preexisting discharge of its duty, not to be abandoned without justification.

Practical problems also dog USAPA's argument. Even if date-of-hire seniority were a *per se* legitimate union objective, what about qualified date-of-hire seniority? USAPA's own proposal includes conditions and restrictions professed to mitigate its

_____

[9] The record contains at least twelve representations to this effect. [*See, e.g.*, doc. ## 80 at 61, 149, 162; 215 at 5 & n.5; 348 at 96; 351 at 3, 8; 359 at 2; 389 at 55; 444 at 6-7; 482 at 1757; 495 at 4-5.] USAPA quite recently stated, "The mere fact that—the mere evidence that Date-of-Hire was preferred by USAPA, that's not itself evidence of anything other than that they preferred an entirely legitimate end. Your Honor, there has never been a case finding Date-of-Hire in a merger context of [sic] violation of the duty." [Doc. # 482 at 1757.]

[10] *Air Wisconsin* also notes in dictum that liability could attend a length-of-service seniority list, that is, a list based upon date-of-hire that accounts for time spent on furlough. 909 F.2d at 215, 217.

date-of-hire aspect. At what point would such conditions and restrictions forfeit the date-of-hire immunity? The fact is, USAPA's very decision to include conditions and restrictions is an acknowledgment that the date-of-hire method is sometimes a Procrustean fit.

### 5. USAPA's Impasse-Related Objective

USAPA asserts that its seniority proposal was justified by its necessity to get any new single CBA. In USAPA's view, ALPA's system of requiring both pilot groups to ratify any new CBA doomed all progress. First, the East MEC had withdrawn its representatives from the Joint Negotiating Committee, halting CBA negotiations indefinitely. Second, USAPA asserts that the East Pilots would never ratify the arbitrated seniority proposal as part of any new CBA. The evidence of a supposed impasse requiring sacrifice of the West Pilots to angry East Pilots was pretextual; in any event, it did not persuade the jury or the Court that an actual impasse existed; and the so-called impasse could not, as a matter of law, justify USAPA's actions toward the West Pilots and the Nicolau Award.

### i. Pretext

The evidence well supports the conclusion, implicit in the verdict and persuasive to the Court, that any asserted impasse was a pretext for bare favoritism of the East Pilots. As soon as the Nicolau Award was announced, USAPA's founder and future president Mr. Bradford wrote that it was necessary to leave ALPA "if this award stands" and "just to protect what little we have left." [Ex. 107 at 1-2.] Later, an attorney advised Mr. Bradford to conceal this objective. [Ex. 14.] A USAPA memo dated February 10, 2008, stated that an attorney had advised USAPA that "if we could replace ALPA as the bargaining agent we could prevail in achieving a Date of Hire seniority integration." [Ex. 315 at 4.] The same memo states, "If ALPA is not there, the award is not there." It shows a deleted sentence stating that "USAPA would not exist" if any lawyer had advised that the renegotiation of seniority was "not possible or very dangerous and likely to fail." Editorial annotations explain that the deletion was necessary to avoid the appearance that

"Ni[c]olau is the only reason for USAPA's existence." [Ex. 315 at 5.] USAPA publicly expressed the sentiment that "ALPA = Nicolau." [Ex. 39.] Some pre-election USAPA correspondence refers to an impasse, but USAPA's "Frequently Asked Questions" pages from the campaign invoke date-of-hire seniority without any discussion of impasse. [Ex. 37, 39, 96, 100-105.] When USAPA does talk about the impasse, it promises to "overturn" the Nicolau Award without any explanation of why this step is needed to get around ALPA's dual-ratification structure. [Ex. 39.] Mr. Bradford, who is beyond the subpoena power of this Court, missed an opportunity for persuasion when he declined to testify and be cross-examined at trial concerning motives and pretext in defense of the union he founded and governed.

### ii. Non-persuasion

The East MEC's walkout from the negotiations did not create an impasse. ALPA possessed the constitutional power to place the recalcitrant East MEC into trusteeship to continue negotiations toward a single new CBA. [Ex. 509/2189 at 89-90.]; *see also Air Wisconsin*, 909 F.2d at 215 (describing use of trusteeship powers to resolve seniority dispute). The former chairman of the West MEC Negotiating Committee testified that ALPA officials were discussing that possibility after negotiations broke down. [Doc. # 475, at 372.] Before certification, USAPA repeatedly asserted that a contract was likely to be presented for ratification soon. [*E.g.*, ex. 100 at 3, 7.] And Doug Mowery, an East Pilot formerly on ALPA's Joint Negotiating Committee, lamented in a March 2008 letter that the East MEC was likely to be placed in trusteeship. [Ex. 20, at 2.][11]

---

[11] USAPA had every opportunity to present evidence that ALPA had abandoned use of its trustee powers, but USAPA did not present any, relying instead upon misrepresentations of the record. [*E.g.*, Doc. ## 451 at 10-11; 482 at 1774-81, 1789-94, 1798-1802]. ALPA pledged not to deprive the two pilot groups of their separate ratification rights, but that pledge would not be inconsistent with imposing a trusteeship on the East MEC in order to conclude, short of ratification, a single CBA incorporating the Nicolau Award.

Nor did the evidence show that the two pilot groups would never ratify a single CBA under ALPA. It is wholly speculative to say the East Pilots would vote against any single CBA incorporating the Nicolau Award no matter how long separate operations continued and no matter the cost to them. The East MEC passed a resolution stating that the East Pilots would never ratify a CBA containing the Nicolau Award, but this self-serving statement about an unknown future is not binding or even persuasive.

Moreover, speculation about what could have been ratified under the ALPA voting system became irrelevant when USAPA was certified as bargaining representative on April 18, 2008. USAPA's structure allows a simple majority of the membership to ratify a new CBA. The lack of an actual and legitimate union purpose for jettisoning the Nicolau Award and the promised improvements in wages and working conditions from a new CBA may yield a majority coalition of East and West Pilots, if not at first, at least eventually.

### iii. Legal insufficiency

Even if an impasse did exist, it would not justify USAPA's actions as a matter of law. Majority opposition does not defeat the duty of fair representation; the duty exists to restrain the majority. *Air Wisconsin*, 909 F.2d at 216. USAPA's argument would allow a union to punish any disfavored minority by pointing to the majority preference in the union as long as that majority threatens to obstruct the collective bargaining process, in this case by hijacking contract ratification. Discrimination and bad faith would be permitted as long as a zealous majority of union members insisted. Majority will alone does not corrupt union action. *See Rakestraw*, 981 F.2d at 1533 ("If the union's leaders took account of the fact that the workers at the larger firm preferred this outcome, so what? Majority rule is the norm."). It does not exculpate all union action, either. The union's obligation to federal labor law includes an obligation to stand up to its membership. USAPA argues that ALPA's merger policy only requires the union to use "all reasonable means" to implement the Nicolau Award, but this phrase is quoted out of context. The policy requires the union to use "all reasonable means . . . to compel the

company to accept and implement the merged seniority list." [MP Pt. 1.I.1.] It does not allow the union to capitulate to an abusive majority.[12]

This principle goes to the core of union politics and bargaining assumptions. A union is required to explain agreements to union members prior to a mandatory ratification vote. *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 183 (2d Cir. 2001). Before and after its election, USAPA has misled the majority about its power to improve their seniority prospects at the expense of the West Pilots. The will of the East Pilots springs from a mistaken understanding of the law and mismanaged expectations. If this is an impasse, it is one USAPA goaded on.

If the membership were correctly advised on the limits of fair representation that constrain the agreement—and all the collective bargaining of every union—then they would perceive no incentive to hold out for an improper bargaining objective. Those employees would be left with a choice: To vote in favor of ratifying a single CBA that incorporated the Nicolau Award, or to vote against it. What they could not do is vote against it and expect the next CBA or the next union to violate the duty of fair representation in the very same way as the first one could not. In effect, USAPA claims that the East Pilots hold such strong objections to the Nicolau Award that they always will vote as a bloc against any new CBA with it, enjoying the self-denial of a single CBA with improved wages and working conditions into perpetuity. Even if this unbelievable story is believed, it only means that the East Pilots have the power of self-inflicted harm. It does not mean that the union's duty of fair representation falls victim to self-hostage-taking.

Whether considered as a matter of fact or law, the asserted impasse does not absolve USAPA from liability.

---

[12]  As a historical matter, the duty of fair representation could not have developed if this impasse theory were valid. Surely, in those early cases, unions that discriminated against black workers were catering to a stubborn racism of the majority. The duty would mean nothing if a majority could undo it by force of stubbornness.

## 6. USAPA's Other Objectives

USAPA asserted a range of other union objectives. These included compliance with its union constitution, compliance with majority will, dissatisfaction with ALPA policies and procedures, and dissatisfaction with the procedures of the Nicolau Arbitration. All of these objectives were rejected as a matter of law.

(1) USAPA's constitutional commitment to date-of-hire seniority does not excuse its acts. "The interpretation or construction of the constitution and laws of a union is for the union." *Laturner v. Burlington N., Inc.*, 501 F.2d 593 (9th Cir. 1974) (quoting *Wirtz v. Local Union No. 125, Int'l Hod Carriers B. & C.L.U.*, 270 F. Supp. 12, 16 (N.D. Ohio 1966)). However, that interpretation does not govern if it would cause the union to "transgress the bounds of reason, common sense, or fairness, or act arbitrarily, or contravene public policy or the law of the land." *Local Union No. 125*, 270 F. Supp. at 16 (quoting 87 C.J.S. Trade Unions § 13, at 766 (late ed.)); *Retana v. Apartment, Motel, Hotel & Elevator Operators Union, Local No. 14*, 453 F.2d 1018, 1024-25 (9th Cir. 1972) (union's internal policies and practices are subject to the duty of fair representation).

(2) Political expediency standing alone—whatever it takes to win an election—does not provide a legitimate union objective. *Truck Drivers*, *Teamsters Local Union No. 42*, *Barton Brands*, and the Ninth Circuit's *Hardcastle* case say with one voice that a union cannot act solely to benefit a majority of employees in the bargaining unit at the expense of the minority.

(3) Dissatisfaction with ALPA policies and procedures, unrelated to the Nicolau Award, could not provide a legitimate objective. The evidence suggested that some East Pilots had general complaints about ALPA and that the seniority issue was just the last straw. The testimony centered on a lack of direct representation, extravagant lifestyles of union officials, loss of pension rights, inadequate contract terms, and inferior safety policies. They also complained that more than a decade ago ALPA, instigated by other pilot groups, subverted a merger that would have benefitted US Airways pilots. The pilots may have had many reasons for abandoning ALPA and they were entitled to do so.

But this case does not turn on the rejection of ALPA.  It turns on USAPA's consequent

motivation to present a new seniority proposal to the airline.  For these reasons, the

instructions prevented the jury from finding that "dissatisfaction with the practices or

policies of the previous union, ALPA, unrelated to the merged pilot seniority list" was a

legitimate union objective in this case.

(4) Dissatisfaction with the previously agreed-upon ALPA merger procedures was

not a legitimate union objective.  Honest disagreement required honesty up front.  It was

only after the Nicolau Award was issued, and the pilots lost their veil of ignorance, that so

many East Pilots decided that the procedures were inherently unjust.  The union cannot

satisfy its duty by catering to this self-interested hindsight.[13]

**7.     Taxonomy of Liability**

It is clear that USAPA's conduct violates its duty as set forth in a special genre of

fair representation cases.  It is less clear what subheading of liability applies: The duty of

fair representation prohibits conduct that is arbitrary, discriminatory, or in bad faith.

This metaphysical question has no impact on the outcome under existing law, but it has

enthralled both parties.

At the outset, USAPA's failure to adopt the Nicolau Award is not "arbitrary" in

the technical sense.  The exercise, even the wrongful exercise, of a union's policy

judgment—including CBA interpretation—is virtually immune to charges of

arbitrariness; liability under this heading has been limited to procedural or ministerial

acts.  *See Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874,

879 (9th Cir. 2007);  *Peters v. Burlington N. R.R.*, 931 F.2d 534, 540 (9th Cir. 1990).  The

_____

[13]  The evidentiary and legal failure of all of USAPA's alleged objectives might have
supported summary judgment or judgment as a matter of law.  However, the urgency of the
case did not leave time to brief and decide summary judgment motions before trial, and
Plaintiffs' motion for Judgment as a Matter of Law did not address the issues necessary for
such a ruling. [Doc. # 446.]

question then remains whether such union actions may be considered "discriminatory" or "in bad faith."

In truth, both headings support liability, separately and together. The original fair representation cases concerned racial discrimination, *see Vaca v. Sipes*, 386 U.S. 171, 177 (1967), and clearly the duty excludes all forms of invidious discrimination based upon protected classes. *Simo v. Union of Needletrades, Indus. & Textile Employees, Sw. Dist. Council*, 322 F.3d 602, 618 (9th Cir. 2003). However, the Ninth Circuit has expressly held that it is "too restrictive" to limit liability to cases of invidious discrimination, and that impermissible discrimination may take other forms. *Id.* at 618-19. For this reason, the jury was instructed that "discriminatory" action could be a basis for liability. The instructions articulated the difference between lawful and unlawful treatment of different employee groups, granting the union wide latitude to resolve conflicting interests even if the resolution adversely affects one group, as long as the union took action to further a legitimate union objective. Contrary to the objections of USAPA, these instructions articulated the contours of unlawful "discrimination" as expressed in the applicable cases. *See Bernard*, 873 F.2d at 216 (prohibiting discrimination "on the basis of union membership"); *Barton Brands*, 529 F.2d at 799 (prohibiting discrimination against the smaller of two merging workforces); *Air Wisconsin*, 909 F.2d at 217 (union's duty prohibits discrimination against "a group of dissidents on the outs with union's leadership"); *Truck Drivers*, 379 F.2d at 144 ("campaign promise to discriminate" against politically weaker employee group is a promise to breach duty of fair representation); *Ramey*, 378 F.3d at 277 (holding that "a union violates [its duty] when it causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds") (quoting *Barton Brands*, 529 F.2d at 799); *Teamsters Local Union No. 42*, 825 F.2d at 611-12 (holding, without limitation, that "discrimination" on the basis of union membership is an unfair labor practice) (citing fair representation cases). USAPA "discriminated" when it adopted a seniority proposal for no reason other than to advantage the majority East Pilots at the minority West Pilots' expense.

1    USAPA also complained at the instruction stage that the jury was given no
2    definition of "bad faith."  The Supreme Court has defined "bad faith" in this context as
3    requiring a showing of "fraud, deceitful action, or dishonest conduct," or personal
4    hostility. *Humphrey v. Moore*, 375 U.S. 335, 348, 350 (1964); *accord Conkle v. Jeong*,
5    73 F.3d 909, 916 (9th Cir. 1995) (referring to "personal animus" as a basis for "bad faith"
6    liability).  At the same time, the Supreme Court has often resorted to the rule that a
7    union's discretion is subject to "good faith and honesty of purpose."  *See Air Line Pilots*
8    *Ass'n v. O'Neill*, 499 U.S. 65, 75-76 (1991); *Metro. Edison Co. v. NLRB*, 460 U.S. 693,
9    707 (1983); *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 67 n.2 (1981); *Hines v.*
10   *Anchor Motor Freight, Inc.*, 424 U.S. 554, 564 (1976); *Humphrey*, 375 U.S. at 342; *Ford*
11   *Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953).
12        In civil law, the forms of fraud range to the bounds of human imagination.  17 Am.
13   Jur. *Fraud* § 1 (2009).  "In fact, the fertility of people's invention in devising new
14   schemes of fraud is so great that courts have always declined to define the term, reserving
15   to themselves the liberty to deal with fraud in whatever form it may present itself."  *Id.*
16   (listing nineteen judicial definitions of fraud); *see also Keith v. Murfreesboro Livestock*
17   *Market, Inc.*, 780 S.W.2d 751, 754 & n.2 (Tenn. App. 1989) (citing Dante Alighieri's
18   personification of fraud as the demon Geryon, a reptile-scorpion-mongrel of a man, to
19   illustrate why fraud is not subject to a "hidebound definition").  The "fraud" or "bad
20   faith" at issue here is an abuse of trust akin to a deliberate breach of fiduciary duties.
21   "Just as a trustee must act in the best interests of the beneficiaries, a union, as the
22   exclusive representative of the workers, must exercise its power to act on behalf of the
23   employees in good faith."  *Chauffeurs, Local No. 391 v. Terry*, 494 U.S. 558, 567 (1990)
24   (citation omitted); *accord O'Neill*, 499 U.S. at 75.  The jury instructions omit the phrase
25   "fraud, deceitful action, or dishonest conduct" because those terms add nothing to the
26   analysis.  Instead, the jury was instructed on a union's duty to represent with "good faith
27   and honesty of purpose," a phrase better suited to the situation here where the union is
28   accused of brandishing a pretext to justify majority self-dealing at the expense of West

Pilots.  Much as a definition of fraud would add nothing to an adequate instruction on embezzlement, no further definition of "bad faith" was needed.  The instructions predicate any liability on the specific facts of USAPA's conduct.

Seniority dispute cases are conceived in terms of both "bad faith" and "discrimination."  Cases imposing liability cite both standards.  *See Bernard*, 873 F.2d at 216 (holding that union may treat groups of employees differently "as long as such conduct is not arbitrary or taken in bad faith"); *Barton Brands*, 529 F.2d at 799 (prohibiting discrimination "on bad faith grounds"); *Truck Drivers*, 379 F.2d at 142 (faulting union for "renounc[ing] any good faith effort to reconcile" employee interests); *Ramey*, 378 F.3d at 276-77 (union has obligation to "exercise its discretion with complete good faith and honesty") (quoting *Vaca*, 386 U.S. at 177);  *Teamsters Local Union No. 42*, 825 F.2d at 611(same).  In these cases, the distinction matters little.  "Bad faith" and "discrimination" become two different labels for the same theory of liability.  None of the applicable cases trouble over this issue of nomenclature, and perhaps rightly so.  *Cf. Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 798 (2d Cir. 1974) (rejecting, pre-*O'Neill*, the strict compartmentalization of fair representation claims and holding that varied labels only serve to emphasize the range of a union's broad discretion).  *But see Rakestraw*, 989 F.2d at 945-48 & n.2 (Ripple, J., dissenting from denial of rehearing *en banc*) (criticizing panel decision for abandoning the tripartite "arbitrary, discriminatory, or in bad faith" standard, which *O'Neill* reaffirmed, in favor of a "cramped interpretation of the duty of fair representation").  It may be that "bad faith" and "discrimination" merge into a single concept that describes the ills at work in this case.  *See Bernard*, 873 F.2d at 216 (prohibiting bad-faith disparate treatment of workers); *Williams v. Pac. Maritime Ass'n*, 617 F.2d 1321, 1330 (9th Cir. 1980) (same); *Ramey*, 378 F.3d at 277 (same). The terminological difference does not affect its proof or defense.

USAPA also objected that Plaintiffs never pled discrimination, that Plaintiffs waived the discrimination instruction on multiple occasions, and that Plaintiffs objected

to it in the drafting phase before finally accepting that term in the final instructions.[14] [Doc. # 482, at 1898.] All of these contentions lack merit. The First Amended Complaint did not mention "discrimination" as a basis for liability because it pled more generally that USAPA acted "arbitrarily, for improper purpose, and/or in bad faith." [Doc. # 86 at 22.] This pleading encompasses the theoretical vestibule of unlawful discrimination, which is a type of "improper purpose." The November 20, 2008 order denying USAPA's motion to dismiss repeatedly referred to discrimination as an operative theory of liability. [Doc. # 84, at 8, 10-13, 18-19.] Plaintiffs have confined their liability case to the facts pled, and their unofficial objections to the discrimination instruction did not comport with applicable law. It is sophistic at best for USAPA to claim surprise here. It was USAPA who first requested, over Plaintiffs' unofficial objection, an instruction on discrimination. [Doc. # 348, at 86-87.]

### B.    Subject Matter Jurisdiction and Ripeness

Jurisdiction being a prerequisite to all remedies, the Court reaffirms its prior holdings on subject matter jurisdiction and ripeness. Adjudicating this case does not intrude upon the jurisdiction of the System Board of Adjustment or the National Mediation Board. [*E.g.* doc. ## 84, at 17-22; 104; 250 at 2; 288 at 3.] Although the Railway Labor Act generally requires exhaustion in breach-of-CBA suits against an employer, there is no statutory or contractual exhaustion requirement in this fair representation suit. The fact that a CBA—the Transition Agreement—and its interpretation form part of the fabric of the fair representation claim does not preclude jurisdiction. Neither the System Board of Adjustment nor the National Mediation Board

---

[14] The referenced objections of Plaintiffs took place during open dialogues about jury instructions and were not Plaintiffs' formal objections. As the Court advised the parties, "for purposes of the rules of civil procedure, the only objections to jury instructions that will count for making the record will be the ones you make at the end. The dialogue that we have in the process are not objections. They are not sufficient. I don't treat them as such. And everyone will have a chance at the end to make their record. But that's not how I see the purpose of the dialogues we have up until then." [Doc. # 390, at 37.]

possesses the statutory power to address or remedy a fair representation claim of this nature. 45 U.S.C. §§ 184 (granting System Board of Adjustment jurisdiction over "disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions"); 45 U.S.C. §§ 152 Ninth, 155, 183 (granting National Mediation Board jurisdiction over election disputes and disputes "between an employee or a group of employees and a carrier or carriers" regarding contract negotiation and other issues).

The Court also maintains its prior conclusion that this case is ripe for adjudication. USAPA has challenged this point repeatedly, most recently on motion for judgment as a matter of law. [Doc. # 445.] At the beginning of the case, the Court held that the claims were ripe because, according to the allegations, it was enough to allege that USAPA has breached its duty by deliberately delaying the single collective bargaining agreement, thereby causing injury to the West Pilots in the form of ongoing furloughs and other detriments. [*See* Doc. # 84:12-13.] During discovery, Plaintiffs retreated from any notion of deliberate delay on the part of USAPA. As has already been held, this change in the factual predicate presents no ripeness problem. [Doc. ## 449; 482 at 1755-56.]

## 1. Ripeness Doctrine

Two factors govern the inquiry into whether a case is ripe: "the fitness of the issues for judicial decision," and "the hardship to the parties of withholding court consideration." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1211-12 (9th Cir. 2006). Both factors favor jurisdiction here.

The issues fit for decision are these: Whether USAPA adopted and presented its seniority proposal without any legitimate union objective, solely to benefit East Pilots at the expense of West Pilots, and if so whether the West Pilots are entitled to damages and an injunction therefor. *See id.* at 1212 (noting that ripeness hinges on "the precise legal question to be answered"). The jury answered the first question in the affirmative. A ruling on relief need not wait for further facts to eventuate themselves. Plaintiffs' case

does not rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Cardenas v. Anzai*, 311 F.3d 929, 934 (9th Cir. 2002) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). USAPA concedes that it will never bargain for implementation of the Nicolau Award. [Doc. # 574 at 1047.] It is constitutionally hostile to doing so. The Airline has accepted the Nicolau Award, expressing no opposition to it, and the union has failed to show any legitimate reason (or plausible future reason) for abandoning it. Liability flows from the process and aims of USAPA's seniority position. The outcome of negotiations is irrelevant. Without an injunction, USAPA's seniority position inevitably impairs the collective bargaining process.

For this same reason, denying judicial review would work a substantial hardship upon the parties, including the Airline. The prospect of a single new CBA holds significant economic consequences for all US Airways pilots, whose wages, working conditions, furloughs, and demotions are on the line. In addition to depriving West Pilots of legitimate representation, USAPA's bargaining position leaves the Airline to decide between a lack of a single CBA and an unlawful single CBA.

### 2. Remedial Concerns

The practicalities of the remedy also support ripeness. As discussed further on, effective relief is available in the form of an injunction requiring USAPA to negotiate for the implementation of the Nicolau Award, which the Airline has already accepted. Even if a CBA were in place, relief could only set aside that agreement and restore the union's proper negotiating position—it could not impose a permanent new CBA term. *H. K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 107-09 (1970) (forbidding NLRB from prescribing terms of CBA); *Hyatt Mgmt. Corp. of N.Y. v. NLRB*, 817 F.2d 140, 143 (D.C. Cir. 1987) (noting that the rule also applies to the courts); *see also Bernard v. Air Line Pilots Ass'n, Int'l*, 873 F.2d 213, 215, 217-18 (9th Cir. 1989) (affirming injunction that set aside "tainted" agreement, established a temporary seniority system, and required union adherence to ALPA merger policy as a new seniority bargaining position). To

withhold relief until the conclusion of corrupted negotiations would accomplish nothing but delay—a hardship to all parties.

### 3. Limitations Cases

Cases from the limitations context confirm that the claim is ripe. Claims are ripe, at the latest, when the statute of limitations begins to run. *See, e.g.*, *Norco Const., Inc. v. King County*, 801 F.2d 1143, 1146 (9th Cir. 1986); *Hensley v. City of Columbus*, 557 F.3d 693, 696 (6th Cir. 2009). The statute of limitations runs on fair representation claims from the time that the asserted injury becomes "fixed and reasonably certain." *Archer v. Airline Pilots Ass'n Int'l*, 609 F.2d 934, 937 (9th Cir. 1979). The West Pilots' asserted injury was "fixed and reasonably certain" as of the time that USAPA presented its seniority proposal to the Airline for improper purposes, abdicating its responsibility to negotiate on behalf of both groups impartially and in good faith.

*Ramey* undergirds this conclusion. *Ramey* held that a union's unequivocal announcement of an intent to breach its duty would only give rise to a ripe claim in limited circumstances. 378 F.3d 269, 278-79 & n.4 (2d Cir. 2004). However, a claim does accrue when the union acts on that intention by presenting its seniority proposal to the company, before the conclusion of a CBA. *Id.* at 279-80. Though the facts of *Ramey* and this case are not identical, the analytical framework is apt.

> The duty of fair representation owed by a union to its members is similar to a contractual duty, and the union's announcement of its intent to advocate against its members' interests may be compared to a party's anticipatory repudiation of a contractual duty. In some anticipatory repudiation cases the aggrieved party may sue immediately after the repudiation is announced. However, the statute of limitations ordinarily does not begin to run, and the cause of action does not accrue, until the date of the actual breach; that is, until the date on which performance is due. . . . Applying this principle to the case at bar, the cause of action accrued on the date on which performance was due, namely the date on which [the union] advocated a position on the seniority issue to USAir.

*Id.* USAPA points out that at the time that the *Ramey* plaintiffs happened to sue, the union had already reached agreement with the airline on seniority integration. This

contention misses the point. The above language makes clear that the *Ramey* plaintiffs' claim accrued prior to the execution of the agreement. The same circumstances are present here. USAPA has made plain its intent never to bargain for the Nicolau Award, and it has advocated its date-of-hire seniority proposal to the company.

### 4. Other Authority

USAPA has cited no precedential authority for dismissing a fair representation claim on ripeness grounds. Indeed, USAPA has cited no federal appellate authority discussing ripeness in the labor context. Perhaps such cases are scarce because the typical inquiry in a fair representation suit is whether a union's past action violated its duty of fair representation—a question ripe by definition. Such was the inquiry in this case, and so it does not raise paradigmatic ripeness concerns of record development or temporal standing. Plaintiffs sought and obtained an adjudication of past and present union action.

USAPA has repeatedly suggested that only the "final product of the bargaining process" is subject to fair representation claims, citing *Air Line Pilots Association v. O'Neill*, 499 U.S. 65, 78 (1991). [*E.g.*, doc. # 36 at 13.] This phrase, carefully plucked from its context, is too slender a reed to support such an elephantine proposition. *O'Neill*'s statement that "the final product of the bargaining process may constitute evidence of a breach of duty" was not directed at ripeness, but rather at the "arbitrariness" standard of reviewing union actions. Reuniting the phrase with the rest of the quoted sentence makes its meaning clear: "[T]he final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.'" *Id.* (citation omitted).

*O'Neill* did not concern the accrual of fair representation claims. It simply held that the union's duty of fair representation, including the arbitrary–discriminatory–bad faith framework, "applies to all union activity, including contract negotiation." *Id.* at 67; *see also Glover v. St. Louis-S.F. Ry. Co.*, 393 U.S. 324, 329 (1969). Nothing in *O'Neill*

prevents the imposition of liability for negotiating activities prior to the conclusion of a CBA.  Rather, the case suggests that the liability may arise sooner because the agreement is only considered as "evidence" of a breach rather than the breach itself.  *O'Neill*'s application of the duty of fair representation to "contract negotiation" underscores this conclusion.  499 U.S. at 67.

It may be the rare case where a redressable fair representation claim accrues in the midst of labor negotiations, which are usually dynamic and uncertain, but it happened here.  In USAPA's hands, the Nicolau Award's time of death has passed; only the time of the funeral is uncertain.  The Transition Agreement resolved the union's internal seniority conflict by way of the Nicolau Award, which USAPA wholly abandons solely to benefit one group of pilots over another.  Indeed, this particular breach of the duty implicates both negotiation and administration of collective bargaining agreements.  *See id.* at 77 (doubting that "that a bright line could be drawn between contract administration and contract negotiation" in every case).

Another district court, considering a suit by a different set of pilots against USAPA, has accepted USAPA's ripeness argument.  *See Breeger v. USAPA*, No. 08-CV-490, 2009 WL 1328902, 2009 U.S. Dist. LEXIS 40489 (W.D.N.C. May 12, 2009).  In *Breeger*, certain East Pilots brought a fair representation suit against USAPA, alleging that USAPA failed to meet a constitutional obligation to reshuffle East Pilot seniority positions established by prior mergers.  The district court adopted a Magistrate Judge's Report and Recommendation, dismissing the case in reliance on *O'Neill* as well as a selection of unpublished federal decisions and state cases.  The Report states, "The parties have not cited, and the undersigned is unaware of, any published federal authority addressing whether a union's conduct may give rise to a ripe [fair representation] claim prior to the conclusion of negotiations with the employer."  It does not address the context of *O'Neill*'s "final product of the bargaining process" language.  It makes no mention of *Ramey*, which was not presented to the court in any brief.  The holding of *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, cited in the Report, does not

preclude suit before a CBA was in place; that case recognized a fair representation claim arising out of a union's failure to reach agreement with the employer, noting that fair representation suits may challenge both CBAs and "the negotiations leading to them." 756 F.2d 1262, 1273 (7th Cir. 1985). Nor is *Federal Express Corp. v.Air Line Pilots Association* applicable here; that case denied declaratory judgment standing in the midst of labor negotiations because there was no "reasonable apprehension of litigation." 67 F.3d 961, 964 (D.C. Cir. 1995). Although the Report does not specifically discuss hardships or the fitness of the issues for judicial decision, the dismissal for lack of ripeness may have reflected the shapelessness of the plaintiffs' theory. The *Breeger* plaintiffs sued to challenge the union's working date-of-hire seniority proposal under a broadly worded constitutional commitment to date-of-hire-seniority, with little more than conclusory allegations of bad faith and discrimination. *See Air Wisconsin*, 909 F.2d at 215-19 (rejecting a similar challenge on the merits).

Nor does the reasoning of *Brooks v. Air Line Pilots Association, International* compel dismissal. __ F. Supp. 2d __, 2009 WL 1883108, 2009 U.S. Dist. LEXIS 55210 (D.D.C. June 30, 2009). In that case, a fair representation claim was dismissed on ripeness grounds because it challenged the position a union took in an administrative grievance proceeding. The outcome of the grievance proceeding, and therefore the harm to the pilots, was entirely contingent and discrete. Conversely, the West Pilots' harm here is not "fear that [USAPA] may succeed with its advocacy," *Brooks*, 2009 WL 1883108, at *3, 2009 U.S. Dist. LEXIS 55210, at *9. It is the present, concrete loss of fair representation, a loss that is certain to continue, which will invalidate or preclude any single collective bargaining agreement with the Airline.

Like *Breeger*, *Brooks* does not address *Ramey*. This Court need not say whether, under the foregoing analysis, factual distinctions would require a different result in *Breeger* or *Brooks*. To the extent any general statements in those cases conflict with the

above reasoning, the Court respectfully departs from their analysis in the specific

circumstances of this case.[15]

## C.  Declaratory and Injunctive Relief

Plaintiffs seek three forms of relief at this stage: (1) A declaration that the Airline

and its pilots, as represented by USAPA, are contractually bound to incorporate the

Nicolau Award; (2) an order directing USAPA "with equal West Pilot representation" to

negotiate a complete single CBA that incorporates the Nicolau Award, and then to present

that CBA for a single ratification vote by all USAPA members;  (3) an order enjoining

USAPA and East Pilots, until the single CBA is in effect, from filing

grievances that would impair the company from implementing the Nicolau Award.[16]  At

this stage, only the second request, in modified form, will be granted.

### 1.  Declaratory Relief

No declaratory relief will be granted.  The First Amended Complaint contains no

specific prayer for declaratory relief, only a general request for "other relief that the Court

deems necessary and proper." [Doc. # 86.]  *See Kam-Ko Bio-Pharm Trading Co.*

*Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) (stating

that declaratory relief must be pled like any other form of relief).  Moreover, because a

permanent injunction will issue, it is unclear what additional effect a declaration would

---

[15]  Other limitations cases USAPA cites offer little guidance because they concern grievance proceedings, *Barlow v. Am. Nat'l Can Co.*, 173 F.3d 640, 643-45 (8th Cir. 1999), the adequacy of pension plan change notices, *Mitchota v. Anheuser-Busch, Inc.*, 755 F.2d 330 (3d Cir. 1985), or other claims founded on the execution of a collective bargaining agreement or subsequent events, without discussion of prior culpable acts. *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298 (3d Cir. 2004); *Hagerman v. United Transp. Union*, 281 F.3d 1189, 1197-98 (10th Cir. 2002); *Ratkosky v. United Transp. Union*, 843 F.2d 869, 873 (6th Cir. 1988); *United Indep. Flight Officers*, 756 F.2d at 1273.

[16]  Plaintiffs originally sought relief directing the Airline to begin using the Nicolau Award for promotions and furloughs by a date certain, even if a new CBA has not been finalized. Plaintiffs withdrew this request during bench trial proceedings. [Doc. # 485, at 58.] For this reason, the bench trial testimony of Plaintiffs' witness Brian Stockdell regarding Airline logistics is not considered and does not affect the analysis. *See supra* n. 3.

have respecting the union's breach of its duty. "Where more effective relief can be obtained by other proceedings, and consequently a declaratory judgment would not serve a useful purpose, the courts are justified in refusing a declaration." *Allis-Chalmers Corp. v. Arnold*, 619 F.2d 44, 46 (9th Cir. 1980) (quoting *Zenie Bros. v. Miskend*, 10 F. Supp. 779, 782 (S.D.N.Y. 1937) and citing Borchard, *Declaratory Judgments* 302, 303 (2d ed. 1941)); 6A *Moore's Federal Practice* ¶ 57.08(3) (2d ed. 1979)). Plaintiffs' first requested form of relief will not be granted.

### 2.     Availability and Propriety of Injunctive Relief

The Supreme Court has expressly allowed injunctive relief in fair representation suits. *Vaca*, 386 U.S. at 195. The appropriateness of such relief varies with the facts of each case, but the Court possesses the power to enjoin the union. *Id.*

USAPA objects that an order directing the union to negotiate for the implementation of the Nicolau Award would violate an age-old rule against the governmental imposition of collective bargaining results, chiefly citing *H. K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 108-09 (1970), and *O'Neill*, 499 U.S. at 74. This rule is inapplicable. The remedy in question will do no such thing. In fact, USAPA relies upon doctrine that undermines its own position. *O'Neill* holds that despite *H. K. Porter Co.* and related authority, courts may review substantive contract terms in fair representation suits. 499 U.S. at 75-77. *Hyatt Management* holds that although the NLRB cannot compel acceptance of new bargaining terms, it is nonetheless "authorized to order the offending party to execute and honor" an existing agreement that it had repudiated. 817 F.2d at 142; *accord Fisk Univ.*, 237 NLRB 1164, 1171-72 (1978); *Raven Indus., Inc.*, 209 NLRB 335, 335, 337-38 (1974); *cf. also Amalgamated Clothing & Textile Workers Union*, 246 NLRB 747, 748 n.4 (1979) (NLRB will not compel union to sign company settlement proposal where union had not agreed to that proposal because doing so would

potentially "forc[e] the parties to rewrite the contract in contravention of" *H. K. Porter*).[17]

Like the NLRB, a court can compel a union to follow self-imposed, nondiscriminatory rules where a failure to do so breaches the duty of fair representation. In *Bernard*, the Ninth Circuit endorsed a preliminary injunction akin to the permanent injunction sought here. 873 F.2d at 217. Invalidating an agreement that contained discriminatory seniority provisions, the district court found that "a new agreement would have to be executed." *Id.* The injunction required ALPA to follow its own negotiation, mediation, and arbitration process in adopting a bargaining position on seniority rights. *Id.* at 215, 217; *see also Beardsly v. Chicago & N. W. Transp. Co.*, 850 F.2d 1255, 1271 (8th Cir. 1988) (cited by USAPA) (remanding with instructions to vacate an unlawful agreement and order the union to negotiate "in line with the [procedural] requirements set forth" in a previous agreement).   In *Bernard*, as here, an injunction enforces the duty of fair representation by negating an improper bargaining position.  A future arbitration was mandated in *Bernard*; here, the arbitration already took place, and the Airline accepted the result.  This difference in timing does not affect the Court's ability to enforce the union's duty.

This remedial authority gives due regard for freedom of contract.  The requested relief does not purport to thrust on the union new or previously unagreed-upon terms.  It merely restores the union to the fulfillment of its duty.  *O'Neill*, 499 U.S. at 74.  *Bernard* did not examine the source of the district court's authority to order such relief, but

---

[17] USAPA quotes *Hyatt Management*'s additional statement that "neither the courts nor the Board can change or nullify substantive contractual provisions."  817 F.2d at 143. *Hyatt Management* relies in turn upon *Pacemaker Yacht Co. v. NLRB*, which contains a more complete and persuasive statement of the rule: "Absent a contractual provision in irreconcilable conflict with federal labor policy, neither courts nor the Board may modify or nullify substantive contractual provisions."  663 F.2d 455, 460 (3d Cir. 1981).  Though the Court is not asked to invalidate any contractual provision at this time, a provision that discriminates in violation of the duty of fair representation may be "in irreconcilable conflict with federal labor policy" and therefore subject to judicial invalidation.  *See Bernard*, 873 F.2d at 217 (affirming injunction that "set aside" an agreement "tainted" by a breach of the duty of fair representation).

*Vaca* leaves that authority subject to circumstances. No lesser remedy would be adequate. The complex intangibles of seniority rights, which affect a wide array of working conditions, defy expression in purely monetary terms. To the extent that the duty of fair representation limits union action, enforcement must follow.

USAPA correctly asserts that the Court is generally without power to enjoin individuals who are not parties to the litigation. Fed. R. Civ. P. 65(d) (providing for injunctive powers against parties and their "officers, agents, servants, employees, and attorneys, and . . . other persons who are in active concert or participation with [them]"); *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009). The East Pilots as a class and the Airline are not agents of the union. No injunction or declaration will issue that is directly enforceable against all East Pilots or the Airline without affording them a full and fair opportunity to be heard. To the extent Plaintiffs seek such relief, their third request is rejected on this basis. However, this rule would not necessarily apply to an injunction against the union that affects employee rights. *See Butler v. Local Union 823, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 514 F.2d 442, 455 (1975) (holding that such an injunction, in appropriate circumstances, does not require joinder of individual employees because it merely enforces an existing legal restraint on the union), *overruled on other grounds by Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 45 n.6 (1979) (punitive damages)*, and United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56 (1981) (statute of limitations).

### 3.    Scope & Nature of Injunctive Relief

USAPA will be ordered to negotiate in good faith for the implementation of the Nicolau Award, defending that award in negotiations and presenting it with the single new CBA to the pilots for ratification vote. This remedy was requested by Plaintiffs and pled in the First Amended Complaint. It promises to address the problem at hand without limiting the negotiation of independent employment terms. Implicitly, it also precludes the union from acting to undermine the Nicolau Award through collateral provisions in

the agreement, and from failing to negotiate toward a single CBA that includes the Nicolau Award.

This injunction and order also illuminates USAPA's untoward objectives, informing the Airline and union members what the union is not permitted to do. To date, the Airline has accepted the Nicolau Award and taken no bargaining position against it. The injunction to follow protects the Airline in that course. The West Pilots' original claims against the Airline for breaching the Transition Agreement were dismissed for lack of subject matter jurisdiction for failing to state any facts that suggested the Airline was acting in concert with USAPA toward improper seniority objectives. The Airline's incentive to avoid needless liability places another healthy constraint on USAPA's bargaining.

USAPA will also be required to negotiate for the implementation of the Nicolau Award as part of any single CBA, unmodified by additional conditions and restrictions USAPA would place upon it. USAPA claims that it has the right to impose new conditions and restrictions, invoking the historical fact that ALPA exerted pressure on the West MEC to accept some form of "mitigation" of the Nicolau List. This very fact undercuts USAPA's request. ALPA exerted pressure because it did not hold unilateral power to deprive the West MEC and the West Pilots of the arbitrated outcome. The West Pilots remain entitled to a union that will not abrogate the Nicolau Award without a legitimate purpose. Any waiver of that right must be "consensual." [Ex. ## 1034 at 1; 1092; 1094.] A jury and this Court have found the union to be motivated by wrongful objectives, and abundant evidence supports that finding. It would indulge those objectives to allow USAPA to alter the Nicolau Award, and it would bestow upon USAPA an unlawful power that ALPA neither possessed nor asserted.[18]

---

[18] USAPA also argues that the First Amended Complaint sought implementation of the "Nicolau List" rather than the "Nicolau Award," and so it left open the union's power to change the Nicolau Award's conditions and restrictions. The Court does not comb the First Amended Complaint so finely, nor does the prayer for relief so tightly restrict the powers of

Similarly, USAPA will be forbidden from negotiating separate CBAs for the two pilot groups, as it argues the Transition Agreement and the Railway Labor Act would have permitted it to do.[19]  Separate negotiations would invite highly probable wrongdoing, which would evade effective judicial remedy and burden the Plaintiffs with more ruinous litigation expense.  The evidence shows not only USAPA's wrongful motives but also willingness to conceal those motives and to bring about its seniority objectives by subterfuge.  Prior to trial, USAPA negotiated only toward a single CBA for both pilot groups. It was only when the verdict was returned that USAPA announced to the Court its intent to seek separate agreements. [Doc. # 485, at 58, 78-81.]  When asked at oral argument several weeks later who held the right to ratify any separate CBA, USAPA could provide no answer.  USAPA should not have the opportunity to strike disparate contract terms for the two pilot groups, making up by indirection for the failure to meet East Pilot seniority ambitions.

USAPA could state no legitimate union reason for pursuing separate agreements.  It asserted only that the Court's order would deprive the union of self-help remedies associated exclusively with those agreements.  This is not so.  The National Mediation Board certified both pilot groups as a single craft, that is, a single bargaining unit, in January 2008.  *US Airline Pilots Association*, 35 N.M.B. 65, 78 (2008).  The parties do not dispute that the West Pilots' CBA is currently amendable, and the East CBA becomes so very soon.  At that point, USAPA would be free to invoke Section 6 procedures for

equity.  ALPA Merger Policy provides that the union shall defend the "opinion and award." [MP pt. 1.H.5.b.]

[19]  Cases cited by USAPA merely hold that it is generally not forbidden to negotiate separate agreements for different groups in a bargaining unit; they do not address the remedial concerns of this case.  *See Ass'n of Flight Attendants v. United Airlines*, 71 F.3d 915, 919 (D.C. Cir. 1995) (noting that the National Mediation Board discourages separate bargaining agreements for different groups of employees within the same bargaining unit); *Ass'n of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432, 1437 (D.C. Cir. 1994); *Bishop v. Air Line Pilots Ass'n, Int'l*, No. 98-359, 1998 WL 474076, at *9, 1998 U.S. Dist. LEXIS 11948, at *27 (N.D. Cal. 2005); *Grand Trunk W. R.R.*, 19 N.M.B. 226, 232 n.1 (1992).

- 47 -

both CBAs, including the National Mediation Board's mediation/arbitration process and possible self-help, in order to negotiate a single CBA that would alter wages and working conditions for the entire bargaining unit. Nothing in the Transition Agreement or the Railway Labor Act provides otherwise. Section V of the Transition Agreement specifies that no rights under the Railway Labor Act are waived, and it provides for additional private mediation regardless of what contracts are amendable. The injunctive remedy poses no harm to the Airline, which has at all times sought the operational integration that a single CBA would bring. If these conditions were to change, either party could seek focused relief from the permanent injunction.

The public interest favors this remedy as well. Separate labor agreements would materially deprive US Airways of the business benefits, now four years delayed, of a merger and combined operations, for no apparent reason but to enable continued unlawful discrimination within the union. To shut this door is part of the minimum necessary to end the game. The pilots must choose between the status quo and a single new CBA that incorporates the Nicolau Award with whatever improvements in wages and working conditions USAPA can negotiate for the East Pilots and the West Pilots alike.

The injunction will not address speculative examples of malfeasance. It will not restrain USAPA's grievance machinery in order to thwart a hypothetical East Pilot plot to obstruct negotiations by filing seniority grievances. There is no evidence of any threat of a bad-faith grievance campaign. If it happens in the future, it may be the proper subject of enforcement or modification of the permanent injunction. The Court will expressly retain jurisdiction to modify, extend, or vacate relief, which should be adequate to meet any unforeseen events.

The injunction will not subject any new CBA to a majority vote of the West Pilots (as Plaintiffs pled) or to a majority vote of each separate pilot group (as USAPA requests as a fall-back). Both requests lack legal grounding. The USAPA constitution requires ratification of any new CBA by a majority vote of the entire membership. The allegations and proof contain nothing to suggest that USAPA's representational structure amounts to

a breach of its duty; USAPA indicates that the West Pilots have been and always will be free to join the union. To grant either of the suggested remedies would, without justification, countermand the election and certification of USAPA as collective bargaining representative. Plaintiffs' proposal goes even farther because it would grant one group of pilots (the West Pilots) a unique power to veto a new proposed CBA for any reason, not just a cure for the violation of a legal right. Plaintiffs' request that USAPA be enjoined to negotiate "with equal West Pilot representation" is too vague to be understood and will not form part of relief.

The Court also rejects USAPA's bold request that the injunction dissolve upon a failed vote to ratify a new CBA containing the Nicolau Award. The duty of fair representation requires USAPA and any successor union to bargain for the implementation of the Nicolau Award. To limit relief as requested would enable the easiest of evasions of this duty. As already explained, the abusive wishes of the majority do not become legitimate simply because they are asserted in a ratification vote. A failed ratification vote gives the union no new power to accommodate a discriminatory majority.

## IV. ORDER

The jury has found USAPA liable to Plaintiffs and the represented class. Damage proceedings remain for the six named Plaintiffs, except for the claims for general refund of union dues and fees, which have been denied as a matter of law. All claims in No. CV 08-1728 PHX-NVW have been adjudicated in favor of the Defendants. It is appropriate now to enter a permanent injunction and a final and enforceable judgment on all claims except Plaintiffs' unadjudicated individual damage claims. The Court does so by a separate Partial Judgment and Permanent Injunction filed herewith. The Court expressly finds no just reason for delay in entry of that judgment and expressly directs that it be entered immediately.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Directed Verdict [doc. # 446] is denied as moot.

1    IT IS FURTHER ORDERED that Defendant USAPA's Renewed Motion for

2    Judgment as a Matter of Law [doc. # 567] and Motion for a New Trial [doc. # 590] are

3    denied.

4    IT IS FURTHER ORDERED that Plaintiffs' Motion to Supplement the Record

5    [doc. ## 580, 582] is denied for the reasons stated in open court on the record.

6    DATED this 17th day of July 2009.

7

8    _____
                              Neil V. Wake
9                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28